[No. 26899-3-III.   Division Three.   September 27, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. KEVIN LEE HILTON, *Appellant*.

84

*Lenell R. Nussbaum*, for appellant.

*Andrew K. Miller, Prosecuting Attorney*, and *Terry J. Bloor, Deputy*, for respondent.

¶1 KORSMO, A.C.J. — For the second time, a jury convicted Kevin Hilton of two counts of aggravated first degree murder in the killings of Josephine and Lawrence Ulrich. His appeal raises numerous issues, three of which we address in the published portion of this opinion. The convictions are affirmed.

## BACKGROUND[1]

¶2 Lisa Ulrich discovered her parents' bodies in their Richland home shortly after 9:00 a.m. on March 21, 2002. Autopsies determined that they had been killed the evening

---

[1] Additional evidence will be discussed in conjunction with the analysis of the respective issues.

before. There was no sign of forced entry. Both had been shot by a .45 caliber handgun.

¶3 Five .45 caliber bullets were recovered from the victims and their house. Police discovered three .45 caliber "A-Merc" brand shell casings at the scene. Knowing the brand to be uncommon, a detective[2] began investigating local gun shops to see which of them sold that ammunition and to whom.

¶4 The Ulrichs were longtime landlords who owned seven residential rental properties in Richland at the time of their deaths. Clasped in Mr. Ulrich's hand was a yellow note folded to conceal a rent receipt for Kevin Hilton in the sum of $3,475, representing the total of several months of back rent he owed the Ulrichs. A file folder containing Mr. Hilton's rental documents was found on top of the couple's refrigerator. It contained a three-day pay-or-quit notice dated March 15, 2002 directed to Mr. Hilton. The receipt book was missing, as was the kitchen telephone handset. The missing telephone had a caller identification (ID) feature. The caller ID feature on an upstairs telephone showed that the last telephone call had been from Kevin Hilton at 6:42 p.m. on March 20.

¶5 Police contacted all of the Ulrichs' tenants on March 21 except for Mr. Hilton. Officers were able to make contact with him the next day; he invited them into his duplex. He explained his whereabouts on the night of the murder—he had shopped for groceries at Winco, returned the book *Hard Time* to the Richland library, and then gone to volleyball practice. He also told them that he owed the Ulrichs $3,475, but they had reached an agreement over the telephone on March 20th on a plan to pay the rent. Police also learned that Mr. Hilton owned several rifles and engaged in competitive shooting events. He said he had previously owned

---

[2] Detective Randy Bricker, who found the A-Merc casings, owned his own firearms shop and was licensed to manufacture and sell firearms and ammunition. He had never before seen the A-Merc stamp. He was assigned to visit the area firearms dealers.

four handguns, including two Norinco .45 caliber handguns. He said that he had sold one Norinco to Dirk Leach and the other to someone at a gun show in Walla Walla six to eight months earlier.[3]

¶6 Police later served a search warrant on Mr. Hilton's duplex. They discovered some used .45 caliber A-Merc shell casings as well as receipts from Schoonie's Rod Shop for A-Merc .45 caliber ammunition. Testing determined that the shell casings had been fired from the same gun used to kill the Ulrichs. The murder weapon was never located.

¶7 The prosecutor ultimately filed two charges of aggravated first degree murder against Mr. Hilton. The case proceeded to jury trial in 2003. Mr. Hilton did not testify in that trial. The jury found him guilty as charged. He then appealed to this court.

¶8 This court determined that the search warrant for the duplex, which had uncovered the matching A-Merc shells, was invalid due to lack of specificity to guide officers in their search. Because the matching shells were very significant incriminating evidence, the convictions were reversed. *State v. Hilton*, noted at 131 Wn. App. 1020 (2006), *review denied*, 158 Wn.2d 1027 (2007).

¶9 The case was scheduled for retrial. Among the many pretrial matters the parties addressed was how to reference testimony from the first trial. Defense counsel requested that the first trial simply be referred to as the "prior proceeding." The trial judge and opposing attorneys agreed with that nomenclature. Report of Proceedings (RP) at 224-226.

¶10 The State also moved in limine to prohibit the defense from accusing Lisa Ulrich of committing the murders. Defense counsel advised the court about numerous topics that Lisa Ulrich had been cross-examined about during the first trial and indicated that the defense in-

---

[3] Police were able to trace only one of the two .45 caliber Norinco handguns. Testing showed that the weapon sold to Mr. Leach was not the murder weapon.

tended to again cover those areas. He did not want the third party perpetrator ruling to limit those areas of inquiry. RP at 201-204. Defense counsel then concluded his argument:

> So, minimally, I think the court should allow what was allowed last time in terms of cross-examination. We don't characterize that as other party perpetrator evidence, and we're entitled to do it under the rules of cross-examination.

RP at 205. The trial court ruled that third party perpetrator evidence would be excluded. The court explained:

> THE COURT: There is nothing in the record that causes me to overrule the former ruling of the court that third party perpetrator evidence will be excluded. It is, once again, excluded. In principle, I don't think the defense has any heartburn with the ruling this time or last. However, I am very sensitive to the fact that defense is entitled to the old sifting and thorough cross-examination.
>
> There are certain items which, to me right now, are in the nature of motion in limine. Ms. Ulrich's shoe size is clearly across the line and constitutes third party perpetrator evidence in my opinion, but there are many other things that have been raised by either the defense or the State that could be either.
>
> You know, records. The discussion about the records, things like that. I'm not prepared at this time to rule those out. In fact, if you're asking me to—in the—to exclude 'em now, I'll deny it. There's gonna be a lot of items that are gonna have to be taken up during the course of the trial on a case-by-case basis as issues arise.
>
> Whether or not you choose to object to—well, they may not even ask the questions about 'em, but if they do ask similar questions about these other things, will you choose to raise an objection this second time around or let it go? I don't know.
>
> So I'll field those objections as they pop up, but I'm inclined to agree with the defense. There's a lot of information that the State is objecting to that may be, might be considered third party perpetrator evidence that is nothing more than thorough and sifting cross-examination of testimony that is developed by the State in its presentation in chief with that witness, and so,

you know, just because it maybe, might be third party evidence, doesn't mean it's gonna be excluded if it has a—some semblance of a bearing on cross-examination of direct testimony of a witness.

RP at 207-208.

¶11 Although the receipts seized from Mr. Hilton's duplex and the matching casings had been suppressed, the prosecutor still sought to admit evidence that Mr. Hilton had purchased A-Merc .45 caliber bullets. The trial court ruled that the Schoonie's Rod Shop owner could testify and her records of the sales could be admitted at trial. The court reasoned that the evidence was admissible under either the inevitable discovery or independent source doctrines. Clerk's Papers (CP) at 26.

¶12 Unlike the first trial, Mr. Hilton testified on his own behalf in the second trial. Typically without objection, the prosecutor was permitted to question Mr. Hilton about the fact that he was familiar with the discovery and prior testimony. The prosecutor also argued in closing that Mr. Hilton had tailored his alibi testimony to fit the State's evidence.

¶13 The jury found Mr. Hilton guilty of both counts of first degree murder and also found that both offenses were committed with the aggravating factor that there were multiple killings committed as part of a common scheme or plan. He was sentenced to life in prison without possibility of parole. He then timely appealed to this court.

¶14 A week after oral argument in this court, the Washington Supreme Court released its decision in *State v. Martin*, 171 Wn.2d 521, 252 P.3d 872 (2011). The parties filed supplemental briefs on the impact of *Martin* to this case.

## ANALYSIS

¶15 The published portion of this opinion addresses the following three issues: (1) whether the trial court erred in

admitting the gun shop evidence under the independent source doctrine, (2) whether the prosecutor violated *Martin* when he questioned Mr. Hilton and argued about his ability to tailor testimony, and (3) whether the trial court erred in excluding third party perpetrator evidence and argument.

## Independent Source Doctrine

¶16 The trial court admitted the gun shop owner's testimony and records under both inevitable discovery and independent source theories. The State concedes that the inevitable discovery doctrine does not apply in Washington,[4] but does contend that the trial court correctly applied the independent source doctrine to admit the evidence. We agree.

¶17 The conclusions of law entered following a suppression hearing are reviewed de novo. *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). Factual findings are reviewed for substantial evidence, i.e., evidence sufficient to convince a rational person of the truth of the finding. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). Unchallenged findings are treated as verities on appeal. *Id.*

¶18 The exclusionary rule generally requires that evidence obtained from an illegal search and seizure be suppressed. *State v. Gaines*, 154 Wn.2d 711, 716-717, 116 P.3d 993 (2005). Evidence derived from an illegal search may also be suppressed as fruit of the poisonous tree. *Id.* at 717; *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). Typically, the testimony of a witness whose identity is discovered through a constitutional violation is not suppressed; the free will of the witness attenuates any taint that led to the discovery of the witness. *E.g.*, *United States v. Ceccolini*, 435 U.S. 268, 274-280, 55 L. Ed. 2d 268, 98 S. Ct. 1054 (1978) (Fourth Amendment violation); *Michigan v. Tucker*, 417 U.S. 433,

---

[4] *State v. Winterstein*, 167 Wn.2d 620, 624, 220 P.3d 1226 (2009).

449-452, 41 L. Ed. 2d 182, 94 S. Ct. 2357 (1974) (Fifth Amendment violation). Washington courts have likewise recognized that the testimony of a witness discovered through a constitutional violation is not subject to suppression. *E.g.*, *State v. Russell*, 125 Wn.2d 24, 57 n.9, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995); *State v. O'Bremski*, 70 Wn.2d 425, 429-430, 423 P.2d 530 (1967); *State v. Dods*, 87 Wn. App. 312, 316-319, 941 P.2d 1116 (1997); *State v. Stone*, 56 Wn. App. 153, 161-162, 782 P.2d 1093 (1989), *review denied*, 114 Wn.2d 1013 (1990); *State v. West*, 49 Wn. App. 166, 168-171, 741 P.2d 563 (1987); *State v. Early*, 36 Wn. App. 215, 220-222, 674 P.2d 179 (1983); *State v. Childress*, 35 Wn. App. 314, 316-317, 666 P.2d 941, *review denied*, 100 Wn.2d 1031 (1983).

■■ ¶19 Evidence tainted by unlawful police action also is not subject to exclusion if it is obtained pursuant to a valid warrant or other lawful means independent of the unlawful action. *Gaines*, 154 Wn.2d at 718; *State v. Miles*, 159 Wn. App. 282, 291-298, 244 P.3d 1030, *review denied*, 171 Wn.2d 1022 (2011); *Murray v. United States*, 487 U.S. 533, 542, 101 L. Ed. 2d 472, 108 S. Ct. 2529 (1988); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 64 L. Ed. 319, 40 S. Ct. 182 (1920). This doctrine is well recognized under both the state and federal constitutions. *Gaines*, 154 Wn.2d at 717, 722 (independent source exception complies with article I, section 7 of the Washington Constitution); *O'Bremski*, 70 Wn.2d at 428-429; *Murray*, 487 U.S. at 537 (citing *Silverthorne Lumber*, 251 U.S. at 392) (if knowledge pertaining to illegally obtained evidence and derivative incriminating evidence is gained from an independent source, the evidence obtained by unlawful government action need not be suppressed). The rationale for the rule is that the police should not be in a worse position than they otherwise would have been in because of the error. *Murray*, 487 U.S. at 537.

■ ¶20 The basic question in applying the independent source rule is determining whether the police activity

" 'was in fact a genuinely independent source of the information and tangible evidence at issue' here." *Miles*, 159 Wn. App. at 294 (quoting *Murray*, 487 U.S. at 542). In *State v. Winterstein*, one of the reasons given by the court for rejecting the inevitable discovery doctrine is that whether the police would have discovered the evidence apart from the constitutional violation "is necessarily speculative." 167 Wn.2d 620, 634, 220 P.3d 1226 (2009). Seizing upon this observation, Mr. Hilton argues that the determination that Detective Bricker found the sales records at Schoonie's Rod Shop independent of the records found in his apartment was also speculative.

¶21 It was not. Well prior to the search warrant for Mr. Hilton's apartment, the police had recognized the unusual ammunition and decided to trace it. Detective Bricker had already contacted the manufacturer, although he had not begun contacting local suppliers, before the search warrant issued.[5] Even after contacting Schoonie's, the detective continued to contact all of the other local ammunition sellers. While at Schoonie's, he did not limit himself to Mr. Hilton's A-Merc records, but obtained the records for all purchasers of that ammunition. In short, the record reflects that the detective was not focused solely on Mr. Hilton, but was identifying other local A-Merc customers as well. Far from simply exploiting information obtained at Mr. Hilton's apartment, the detective was thoroughly pursuing a lead first developed at the murder scene.

¶22 When dealing with derivative evidence, the factual question that must be answered under the independent source doctrine appears similar to the issue presented by the inevitable discovery doctrine. However, it is not the same. Inevitable discovery involves evidence that was wrongly obtained. Washington courts will not entertain the speculative question about whether the police ultimately would have obtained the same information by other, lawful

---

[5] Mr. Hilton's challenge to finding of fact 22 is correct; the record does not reflect that Detective Bricker received the directive to check the local firearms dealers before the search warrant issued.

means. In contrast, inevitable discovery *in the context of derivative evidence*, necessarily deals with evidence that itself was not unlawfully obtained. Instead, the question is whether the process of obtaining the derivative evidence was tainted by an earlier illegality. This factual problem necessarily looks to what the police were doing and what motivated them to take the action they did. But it does not involve the speculative question of whether they later would have actually found the evidence by some legal means. Whether lawfully obtained (i.e., there is no question of additional illegality beyond the original error) evidence was tainted by earlier unlawful actions does not present a speculative question of what the officers might have done next.

¶23 In its findings, the trial court correctly focused on the facts of the investigation to determine that the derivative evidence was discovered independent of the original search warrant.[6] Police were aware of the uncommon ammunition and were attempting to ascertain its local sources. The investigation focused on all local ammunitions stores and all customers, not just the one source known to have sold to Mr. Hilton. The record reflected a thorough investigation rather than simply leaping from the evidence uncovered at the apartment to Schoonie's Rod Shop. The trial court correctly admitted the evidence under the independent source doctrine.

¶24 Accordingly, Ms. Schoonover's testimony and her records[7] were both properly admitted under the independent source doctrine. Additionally, Ms. Schoonover's testimony was too attenuated from the improper search warrant

---

[6] The court explicitly found Detective Bricker's testimony credible and determined that his efforts preexisting the search and independent of it would have led him to Schoonie's. We do not disturb credibility decisions. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

[7] In light of our conclusion, we do not address the State's alternative argument that Mr. Hilton lacked standing to challenge Ms. Schoonover's decision to provide her records to the police. We likewise do not address the question of whether any error in this regard would have been harmless or not.

to be subject to the exclusionary rule. *O'Bremski*, 70 Wn.2d at 429-430. For both reasons, there was no error.

### The Allegedly Tailored Alibi

¶25  Mr. Hilton alleges that the prosecutor engaged in misconduct by questioning him about his ability to change or tailor his alibi to meet the evidence from both the first trial and the current trial and then arguing the topic to the jury. We conclude that the prosecutor's actions were consistent with *Martin* and did not constitute error.

¶26  *Martin* presented the question whether article I, section 22[8] of the Washington Constitution permits a prosecutor to cross-examine a defendant in a manner that suggests the defendant's testimony was tailored to meet the evidence presented at trial. The United States Supreme Court had previously decided that the Sixth Amendment did not prohibit a prosecutor from arguing that the defendant's presence in the courtroom allowed him to tailor his testimony to meet the evidence and, hence, the defendant's testimony should not be believed. *Portuondo v. Agard*, 529 U.S. 61, 146 L. Ed. 2d 47, 120 S. Ct. 1119 (2000). Justice Ginsburg had dissented in *Portuondo*, arguing that while cross-examination of the defendant about his ability to tailor testimony would have been proper, a generic closing argument unrelated to the defendant's trial testimony was improper. *Id.* at 76-79.

¶27  In *Martin*, the defendant had answered a question during direct examination by referring to testimony he had heard during trial. 171 Wn.2d at 524. He also answered a cross-examination question in the same manner. *Id.* The prosecutor then addressed the point in further cross-examination, asking the defendant if he had heard the trial

---

[8] The portions of this provision at issue here include the "accused shall have the right to 'appear and defend in person, . . . to demand the nature and cause of the accusation against him, to have a copy thereof, to testify in his own behalf, to meet the witnesses against him face to face, . . . to have a speedy public trial . . . and the right to appeal in all cases.'" *Martin*, 171 Wn.2d at 529 (quoting WASH. CONST. art. I, § 22).

testimony and also inquiring about his access to the police reports while the case was pending. *Id.* at 524-525. There is no indication in *Martin* whether the prosecutor discussed the issue during closing argument.

¶28 The *Martin* majority conducted the analysis required by *State v. Gunwall*[9] and concluded that the noted provisions of article I, section 22 did provide greater protection than the Sixth Amendment in this context. 171 Wn.2d at 528-533. The majority then turned to the question of how protective Washington's constitution was in this context. The majority concluded that a portion of Justice Ginsburg's *Portuondo* dissent was the appropriate standard for Washington—cross-examination on the ability to tailor would be permitted. *Id.* at 535-536.[10]

¶29 Application of *Martin* to this case requires some discussion of the record. At the first trial, and again in the second trial, the prosecution worked to disprove the alibi Mr. Hilton had provided during his interview with the police. Evidence was introduced that Mr. Hilton did not appear on the Winco store's video system; it showed everyone who entered or exited the building. Library records also showed that Mr. Hilton had returned *Hard Time* on March 19, not March 20. Library records showed that he next used the library on March 21, when he returned two books and checked out another book. Evidence also was introduced that the most recent gun show in Walla Walla had taken place 14 months before the killings. That testimony undercut Mr. Hilton's statement to the police that he had sold a .45 caliber Norinco at a show there six to eight months earlier.

¶30 When counsel called Mr. Hilton to the stand, the very first question asked was "you sat through this trial

---

[9] 106 Wn.2d 54, 720 P.2d 808 (1986).

[10] Because the tailoring cross-examination was specific rather than general, the court declined to address the question of whether a generic tailoring argument unrelated to the testimony would be permitted. *Id.* at 536 n.8.

and heard the testimony, correct?" The response was "[y]es." RP at 3518. Mr. Hilton testified that he had gone to Albertson's, not Winco, for his groceries that night. He also testified that he must have returned paperback books, about which no records are kept, on March 20 instead of the hardback book that library records showed had been returned on the 19th. The noted testimony led to the following exchanges on cross-examination, none of which drew any objections:

Q . . . [Y]ou're aware that the police didn't get any kind of video surveillance from Albertsons, aren't you?

A I don't know if they did or not.

Q Well, you sat through one proceeding, didn't you?

A Uh-huh.

Q And you sat through this proceeding, didn't you?

A Yes, I did.

Q And according to your knowledge, there was never any video attempted to be gained from anywhere but Winco; is that right?

A That's what I heard.

RP at 3604-3605.

¶31 With respect to the library records, the cross-examination included:

Q And you say you realized you were wrong about that after you talked to Detective Hansens; isn't that right?

A Quite a bit later actually, yes.

Q Quite a bit later, and there's been a prior proceeding, correct?

A Yes.

Q And this trial?

A Yes.

RP at 3608. The prosecutor later asked again:

Q You've had a chance to sit through one proceeding; is that correct?

A Yes.

Q And now this proceeding?

A Yes.

RP at 3609.

¶32 The parties dispute whether *Martin* is limited to cases where the defendant opens up the topic during direct examination. The *Martin* majority had noted the defendant's answer to a question had referenced "prior testimony" in the trial and stated, "In our judgment, this testimony opened the door to questions on cross-examination about whether he tailored his testimony to evidence presented by other witnesses." 171 Wn.2d at 536. The court again noted the defendant's reference to other testimony before stating:

> In sum, we believe that in a case such as the instant, where the credibility of the defendant is key, it is fair to permit the prosecutor to ask questions that will assist the finder of fact in determining whether the defendant is honestly describing what happened.
>
> We conclude, therefore, that the State did not violate article I, section 22 by posing questions during cross-examination that were designed to elicit answers indicating whether Martin tailored his testimony.

*Id.*

¶33 We need not decide if Mr. Hilton's narrow reading of *Martin* is warranted because even under his view, he certainly opened the door to cross-examination on tailoring. First, the initial question of direct examination squarely presented the issue. Second, as in *Martin*, his testimony about the day he returned *Hard Time* to the library admittedly changed in accordance with information he learned during the two trials. Third, his testimony varied from his initial statement to the police in three important aspects—what books he returned to the library on March 20, when he had sold a Norinco .45 caliber handgun at a Walla Walla gun show, and what grocery store he visited on the evening of the 20th. Any one of these pieces of testimony opened up the door; in combination, they kicked the door down.

¶34 We thus conclude that the prosecutor fairly cross-examined the defendant on these topics. The defendant's initial March 2002 alibi that he had been at the library and the Winco store during the time of the killings, and that he recently had disposed of his last .45 caliber gun in Walla Walla, had been discredited during the first trial. His new story, which also provided an alibi for the time of the killings, was properly tested by questioning about his knowledge of the inadequacies of the original story and his opportunity to correct them.

¶35 There was no error in cross-examination.

¶36 The prosecutor here went further than in *Martin* and also addressed in closing argument the defendant's ability to tailor his testimony. There was no objection to the following argument from the prosecutor:

> He didn't show you any emotion. He didn't make eye contact. In fact, he avoided eye contact when he was testifying with you. The defendant was calculated in his answers. And the defendant was certainly rehearsed, and he's had since the murders, six years, in order to rehearse and calculate what he was gonna get up here and tell you.
>
> . . . .
>
> . . . He thinks he can outsmart me. And he thinks he can outsmart you. He's had six years to make this up. Six years to hear all the evidence, six years to get up there and weave a tale to you, and he's had the benefit of knowing all the evidence from a prior proceeding and this case.

RP at 3839-3840.

¶37 The general rule is that a prosecutor can properly draw reasonable inferences from the evidence admitted at trial and argue those inferences to the jury. *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991). The prosecutor can also argue that the evidence does not support the defendant's theory of the case. *Russell*, 125 Wn.2d at 87. The defendant must object to the prosecutor's allegedly improper argument to preserve a claim of error

unless the argument was so "flagrant and ill intentioned that no curative instructions could have obviated the prejudice." *State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988).[11]

■ ¶38 As noted previously, the *Martin* majority did not address the issue, which had divided the court in *Portuondo*, of whether a *generic* tailoring argument would be proper. 171 Wn.2d at 536 n.8. This case does not truly present that issue, either, since the defendant was cross-examined about tailoring and the prosecutor's argument directly tied the credibility of defendant's testimony to his opportunity to prepare it. This was not a generic tailoring argument because it had a basis in the cross-examination. There was nothing improper about the argument because it was reasonably drawn from the testimony admitted at trial. *Hoffman*, 116 Wn.2d at 95.

¶39 It was proper to cross-examine the defendant about the changes in his story and his opportunities to prepare those changes. It was thus also proper to argue the issue to the jury. 116 Wn.2d at 95. The defendant's constitutional rights under article I, section 22 were not violated.

*Third Party Perpetrator Evidence*

¶40 Mr. Hilton strenuously argues that the trial court erred in prohibiting him from arguing that Lisa Ulrich murdered her parents. This argument fails for two reasons. First, he never sought to blame her for the killings and does not get to change his theory on appeal. Second, he never made the requisite showing to allow him to make the argument at trial.

■ ¶41 A criminal defendant has a constitutional right to present evidence in his own defense. *Washington v. Texas*,

---

[11] In light of our conclusion, we do not address the State's argument that the issue was not preserved because the closing argument could not be "flagrant and ill intentioned" since it was permitted under existing law at the time it was made: *Portuondo*, 529 U.S. 61, the Court of Appeals' version of *State v. Martin*, 151 Wn. App. 98, 210 P.3d 345 (2009), and *State v. Miller*, 110 Wn. App. 283, 40 P.3d 692, *review denied*, 147 Wn.2d 1011 (2002) (both applying *Portuondo*).

388 U.S. 14, 19, 18 L. Ed. 2d 1019, 87 S. Ct. 1920 (1967); *State v. Thomas*, 150 Wn.2d 821, 857, 83 P.3d 970 (2004); *State v. Maupin*, 128 Wn.2d 918, 924, 913 P.2d 808 (1996). There is, however, no right to present irrelevant or inadmissible evidence. *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983).

¶42 Washington permits a criminal defendant to present evidence that another person committed the crime when he can establish " 'a train of facts or circumstances as tend clearly to point out some one besides the prisoner as the guilty party.' "[12] *State v. Downs*, 168 Wash. 664, 667, 13 P.2d 1 (1932) (quoting *Greenfield v. People*, 85 N.Y. 75, 89 (1881)); *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992), *cert. denied*, 508 U.S. 953 (1993). The United States Supreme Court recently has approved this standard for admitting "third party guilt" evidence. *Holmes v. South Carolina*, 547 U.S. 319, 327, 164 L. Ed. 2d 503, 126 S. Ct. 1727 (2006).[13] When the State's case is entirely circumstantial, the *Downs* rule is relaxed to an extent to allow a reply in kind: the "defendant may neutralize or overcome such evidence by presenting sufficient evidence of the same character tending to identify some other person as the perpetrator of the crime." *State v. Clark*, 78 Wn. App. 471, 479, 898 P.2d 854 (citing *Leonard v. Territory of Wash.*, 2 Wash. Terr. 381, 396, 7 P. 872 (1885)), *review denied*, 128 Wn.2d 1004 (1995). As the proponent of the evidence, the defendant bears the burden of establishing relevance and materiality. *State v. Pacheco*, 107 Wn.2d 59, 67, 726 P.2d 981 (1986).

¶43 Mr. Hilton contends that *Holmes* permits him to argue that Lisa Ulrich was the murderer. The initial problem with this approach is that he never attempted to make that argument in the trial court. Instead, the whole defense

---

[12] Evidence of possible motive alone is insufficient to establish this nexus. *State v. Kwan*, 174 Wash. 528, 533, 25 P.2d 104 (1933); *State v. Condon*, 72 Wn. App. 638, 647, 865 P.2d 521 (1993), *review denied*, 123 Wn.2d 1031 (1994).

[13] *Holmes* cited *Thomas* as following this rule. 547 U.S. at 327 n.*.

argument on this topic was that he needed to cross-examine Ms. Ulrich to the extent he had in the prior trial in order to establish her bias and/or poke holes in the State's case by challenging her memory. He never claimed that he wanted to argue to the jury that she was the killer. Instead, Mr. Hilton's counsel argued that the evidence he sought to admit should not be characterized as third party perpetrator evidence. RP at 204.

¶44 Appellate courts will consider evidentiary challenges only on theories that were raised at trial. *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986); *State v. Boast*, 87 Wn.2d 447, 451-452, 553 P.2d 1322 (1976). As explained in *Guloy*:

> A party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial. Since the specific objection made at trial is not the basis the defendants are arguing before this court, they have lost their opportunity for review.

104 Wn.2d at 422 (citation omitted).

¶45 Here, defense counsel at trial objected to the State's motion in limine only to the extent that it could be read as limiting the cross-examination of Lisa Ulrich. Both in writing and orally to the trial court, defense counsel disclaimed any interest in pursuing a third party suspect theory. There was no offer of proof setting forth sufficient evidence to put forth the theory. The most that can be said is that the defense wanted to point out that the case against their client was no stronger than a case against Lisa Ulrich would be. CP at 626-27. That is not the same as arguing that she actually committed the murder.

¶46 The defense did not want to actually blame Ms. Ulrich for her parents' murders at trial. The defense theory cannot now be amended to argue what it did not desire to argue before. The challenge to the trial court's in limine ruling on third party suspects was waived.

¶47 Even if it had not been waived, the argument is without merit. The defense did not present, or even offer to

present, sufficient evidence to blame Ms. Ulrich for the killings. As noted, third party perpetrator evidence may be presented when there is " 'a train of facts or circumstances as tend clearly to point out some one besides the prisoner as the guilty party.' " *Downs*, 168 Wash. at 667 (quoting *Greenfield*, 85 N.Y. at 89). Even when dealing with a circumstantial evidence case, the defendant can respond in kind "by presenting *sufficient evidence* of the same character *tending to identify some other person* as the perpetrator of the crime." *Clark*, 78 Wn. App. at 479 (emphasis added). Even when using circumstantial evidence, Mr. Hilton still must present sufficient evidence tending to identify Lisa Ulrich as the killer. The defense did not make that showing here.

¶48 Mr. Hilton argues that Lisa Ulrich had motive (inheritance) and opportunity (she lived close by), but the facts did not suggest that she could have committed the crimes. There was no showing that she had access to a .45 caliber handgun or A-Merc ammunition, let alone that she even knew how to use such a weapon, especially with the skill shown by the killer. There was no evidence that she returned to her parents' home that night. Although Mr. Hilton takes issue with the strength of Ms. Ulrich's alibi,[14] his disputes do not affirmatively show that she could have committed the crimes. His circumstantial evidence was insufficient to allow him to argue that she killed her parents.[15]

¶49 Nothing in *Holmes* changes the law of Washington, which the *Holmes* opinion cited favorably. 547 U.S. at 327 n.*. Instead, *Holmes* addressed a situation where South Carolina state law allowed a trial judge to exclude third party perpetrator evidence when the State's case was

---

[14] Lisa Ulrich was in the presence of her boyfriend and children during the period when her parents were murdered.

[15] In contrast, *Clark* is a case where sufficient circumstantial evidence was presented to suggest that the other suspect could have committed the crime (arson). The other suspect had threatened the victim and had a strong revenge motive, his car was seen near the crime scene, and he told others that the defendant had not committed the crime. 78 Wn. App. at 474-475, 479-480.

forensically strong. *Id.* at 323. The United States Supreme Court concluded that rule "radically changed and extended" the common law rule and diminished the defendant's right to present his defense. *Id.* at 328. The result was to deny the defendant a fair trial. *Id.* at 331.

¶50 This case is not *Holmes*. The trial court properly allowed the defense wide scope to cross-examine Ms. Ulrich; there was little the defense was precluded from doing. Mr. Hilton was allowed to develop her alleged bias against him, to explore inconsistent testimony for memory lapses, and to inquire about supposedly suspicious behavior that evening. Mr. Hilton's counsel accomplished what he told the court prior to trial he wanted to accomplish.

¶51 It is highly unlikely that trial counsel would have pursued an argument that Ms. Ulrich killed her parents because the case against her was so weak that it would have made the defense look desperate. The alleged motive, an inheritance, was weak since that motive had existed most of her adult life; there was no showing that her financial situation had recently deteriorated. She also would have no reason to steal the answering machine or the receipt book. She would had to have then framed Mr. Hilton without knowing what kind of alibi he might have, and she would have had to commit the crimes with the type of weapon Mr. Hilton had once owned and with rare ammunition that he was one of the few people in the region to use. She also would have needed to be fortunate enough to do all of this during the time period when Mr. Hilton happened to telephone her parents' house. The theory that Lisa Ulrich killed her parents was completely unsupported by the facts. Experienced trial counsel understandably had no interest in pursuing the claim, which is likely why they never sought to show the trial court that they had the evidence to do so. Instead, counsel aptly, albeit unsuccessfully, chose instead to try to persuade the jury that Lisa Ulrich was biased and not credible.

¶52 Mr. Hilton waived the argument that Lisa Ulrich murdered her parents. He also failed to present sufficient

evidence to allow him to present the theory to the jury, even if he had wanted to do so. For both reasons, the argument is without merit.

¶53 Affirmed.

¶54 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

BROWN and SIDDOWAY, JJ., concur.

Reconsideration denied October 31, 2011.

Review denied at 173 Wn.2d 1037 (2012).