IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37375-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MICHAEL S. THOMPSON, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Michael Thompson appeals his convictions for attempting to elude a police vehicle, two counts of possession of a stolen motor vehicle, second degree possession of stolen property, possession of a controlled substance— methamphetamine, and possessing a motor vehicle theft tool.

The State concedes that Mr. Thompson's two convictions for possession of a stolen motor vehicle and his conviction for possession of a controlled substance must be reversed and dismissed. We agree. We affirm Mr. Thompson's remaining convictions and remand for resentencing.

FACTS

Michael Thompson was charged with several offenses following his attempt to elude a sheriff's deputy conducting a lawful traffic stop.

*Initial pursuit of the Chevrolet Blazer*

In the early morning of December 18, 2016, Spokane County Deputy Sheriff Jason Hunt attempted to pull over a Chevrolet Blazer towing a loaded snowmobile trailer with expired registration. After Deputy Hunt activated his emergency lights, the Blazer accelerated and began to flee, eventually driving into a snowy field. The deputy was unable to pursue in his patrol vehicle, but he and other units set up perimeter containment of the field. He did not get a good look at the driver.

Deputy Hunt proceeded into the field on foot, where he found the Blazer crashed down an embankment. The vehicle was unoccupied and no one was present. The snow plainly showed a single set of footprints emerging from the vehicle, but they did not lead away into the distance. The trailer was missing one of the two snowmobiles Deputy Hunt had previously seen loaded on it, leaving behind broken orange tie-down straps.

Inside the abandoned Blazer, a number of Mr. Thompson's personal belongings were found, including a motorcycle helmet with the word "Thompson" spelled in sticker

2

letters. Report of Proceedings (RP) at 267. Deputies also found a number of shaved keys and methamphetamine in the Blazer.

*Tracking the snowmobile*

While arriving to assist in the containment, Deputy Brandon Wilson saw a snowmobile leaving the containment area. He was separated from the snowmobile due to a train crossing the road, but was then able to follow the snowmobile tracks to a nearby house. He observed the tracks leading from the road through a chain link gate into the backyard and disappearing under a blue tarp.

Behind the house was a large open field, and Deputy Krystal[1] Bitzer and her training officer circled around into the field to look into the yard through the chain link fence. From the open field behind the house, the deputies saw a snowmobile in the corner of the yard, partially covered by the tarp. The snowmobile had orange tie-down straps attached that appeared to be broken, matching the remnants on the trailer.

*Search of the property*

While Deputy Bitzer was in the field behind the house, her sergeant was speaking with the homeowner, Erin Morris, at the front door. The sergeant communicated to the

---

[1] Deputy Bitzer's first name is alternately spelled "Crystal" and "Krystal" in the reports of proceedings; police reports in the record indicate the spelling is "Krystal."

3

other deputies that Ms. Morris gave consent to *enter* the backyard. Three deputies including Deputy Bitzer went into the backyard, moved the tarp off the snowmobile, and felt that the snowmobile engine was still warm. Deputy Bitzer went to the front of the house and spoke with Ms. Morris, who denied Mr. Thompson was home but gave permission to go into the house to search for him.

The computer aided dispatch (CAD) report from the incident shows that a deputy reported the snowmobile was warm to the touch at 2:32 a.m. on December 18. The search consent waiver form was signed by Ms. Morris indicating consent to search her "'house and yard including back'" *after* that time, at either 2:35 or 2:39 a.m. Clerks Papers (CP) at 89.

Deputies Bitzer and Wilson entered the residence after Ms. Morris gave informed consent. Mr. Thompson was standing in the living room of the residence and had a flushed face as though he had just been out in the cold. Deputy Wilson, who had experience snowmobiling, noted the flush was similar to what he experienced when he came inside a warm building after snowmobiling without protective gear. Mr. Thompson told the deputies he had been snowmobiling the previous day, but had been home since 10:00 p.m. that evening and had been asleep for several hours. He said he had recently purchased the snowmobile in the backyard from a friend. He retrieved his winter boots to

4

show the deputies, which were wet but did not match the tread of the prints at the scene of

the truck. As they left, Deputy Bitzer noticed that the flush in Mr. Thompson's face was

almost gone.

### Trial court proceedings

#### Charges

Deputies determined that the snowmobiles and trailer had been stolen shortly

before the pursuit. Mr. Thompson was charged with six offenses:

> (1)  attempt to elude a police vehicle;
> (2)  possession of a stolen motor vehicle, a 2007 Polaris snowmobile;
> (3)  possession of a stolen motor vehicle, a 2007 Polaris snowmobile;
> (4)  second degree possession of stolen property other than a firearm or
> a motor vehicle, a 2004 Triton trailer valued over $750;
> (5)  possession of a controlled substance, methamphetamines; and
> (6)  making or possessing a motor vehicle theft tool, shaved keys.

CP at 104-05.

#### Suppression hearings

Before trial, Mr. Thompson moved to suppress the evidence gained as a result of

the warrantless search of the home's backyard. Mr. Thompson argued the deputies

entered the backyard before they had consent from Ms. Morris for a search, as reflected in

the CAD report. The State argued deputies observed the snowmobile from outside the

property until Ms. Morris gave consent to search the backyard. The evidence at the

hearing persuaded the trial court that the deputies uncovered the snowmobile and touched it before Ms. Morris gave informed consent to search her home and yard. Accordingly, it suppressed the evidence from the illegal search of the yard and evidence after the search as fruit of the poisonous tree.

The court left open the possibility that it would reconsider its ruling upon a motion by the State and testimony by Ms. Morris. The State accordingly moved the court to reconsider. The State argued that additional testimony from Ms. Morris would clarify the timing and voluntariness of her consent to search her backyard. It also argued that any evidence obtained after the search of the backyard should not have been suppressed under the independent source doctrine because Ms. Morris's consent to search the house was obtained due to information other than the heat of the snowmobile. Mr. Thompson did not address the application of the independent source doctrine, opposing the reconsideration solely on the grounds that Ms. Morris's testimony had been available at the prior hearing and the State was not entitled to remedy its tactical error.

At the hearing to reconsider the suppression, the superior court declined to hear new testimony based on its intervening review of case law and its conclusion that the State had no new evidence to present. The court nonetheless partly reversed its ruling excluding evidence based on the independent source doctrine, which had not been briefed

before the prior hearing.  In relevant part, the trial court's reconsideration conclusions of

law state:

> III.    For evidence to be suppressed as "fruit of the poisonous tree" there must be a causal connection between the illegal action and the evidence.
>
> . . . .
>
> V.    However, there is no proximate cause between the search of the yard and the search of the home;
>
> . . . .
>
> VII.    Here consent to search the house was gained from independent evidence outside of the illegal search of the yard, i.e. observing the snowmobile and tie down strap from a legal vantage point, tracking the snow-mobile [sic] to the specific residence;
>
> VIII.    "[E]vidence tainted by unlawful governmental action is not subject to suppression under the exclusionary rule, provided that it ultimately is obtained pursuant to a valid warrant *or other lawful means* independent of the unlawful action." *State v. Gaines*, 154 W[n].2d 711, 718, 116 P.3d 993 (2005).
>
> . . . .
>
> X.    Again, here there was no causal connection between the initial search of the yard and the [subsequent] search of the house which was conducted after Ms. Morris provided consent.

CP at 102.

Accordingly, the court suppressed the evidence from the entry and search of the

backyard, but ruled admissible the evidence gained after Ms. Morris's informed consent

to search her home.

*Trial and sentencing*

Mr. Thompson proceeded to a jury trial. The State presented testimony from several deputies about the pursuit of the Blazer and the subsequent tracking of the snowmobile to Ms. Morris's house. Deputy Bitzer's testimony included her observation of Mr. Thompson's flushed face inside the house, his statements about riding a snowmobile earlier that day, and her observation of Mr. Thompson's snow boots. Deputy Wilson similarly testified about Mr. Thompson's flushed face as though he had been snowmobiling without protective gear.

Ms. Morris testified that a friend of Mr. Thompson brought the Blazer and snowmobiles to her house the day before the pursuit. She recalled that Mr. Thompson left to ride the snowmobile along the train tracks around 10:00 p.m. the night of the pursuit and was still out when she went to sleep around 11:00 p.m. She slept until the deputies knocked on her door. When the deputies at the door asked about Mr. Thompson, she closed the door, looked for him, and found him in the upstairs living room. This was unusual because Mr. Thompson rarely spent time upstairs and their children primarily used the living room. It also indicated he had entered the house from the backyard because he would have awakened Ms. Morris using other entrances. This was in itself unusual because there was no reason for him to come in from the backyard at night.

Ms. Morris admitted that she denied Mr. Thompson was home to the deputies even after locating him, but consented to their entry to search for him.

Ms. Morris testified that after the deputies left, Mr. Thompson told her he did not know that the snowmobiles were stolen when she asked why he ran from the police. She also identified several items of Mr. Thompson's that were found in the Blazer and testified that Mr. Thompson decorated many of his personal items with sticker letters. She acknowledged that there were items found in the Blazer that she could not identify as his.

The State presented footage from a neighbor's security camera that showed the Blazer and loaded snowmobile trailer leaving first at 10:24 p.m. and returning at 10:38 p.m., then leaving again at 1:39 a.m. and not returning.[2] This was several hours later than Thompson had said he went riding and during the period he claimed to be home asleep.

The jury found Mr. Thompson guilty on all six counts. He was sentenced to a 50-month prison-based drug offender sentencing alternative.

Mr. Thompson timely appealed to this court.

---

[2] The neighbor's recording system had the time set incorrectly, leading to a 51 minute discrepancy between the time displayed on the videos and the actual time. The recording of the Blazer and trailer leaving, returning, and leaving again displayed times of 11:15 p.m., 11:29 p.m., and 2:30 a.m., respectively, which corresponds to actual times of 10:24 p.m., 10:38 p.m., and 1:39 a.m.

No. 37375-4-III
*State v. Thompson*


ANALYSIS

<small>SUPPRESSION OF EVIDENCE IN MR. THOMPSON'S HOME</small>

Mr. Thompson contends the evidence obtained subsequent to the illegal search of his backyard must be suppressed. We disagree.

We review the trial court's conclusions of law from an order regarding the suppression of evidence de novo. *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). Unchallenged findings of fact are treated as verities on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

Article I, section 7 of the Washington Constitution protects against unwarranted governmental intrusion into a person's private affairs. The Fourth Amendment to the United States Constitution provides similar protection, prohibiting unreasonable searches and seizures. Based on these constitutional protections, "warrantless seizures are per se unreasonable." *State v. Doughty*, 170 Wn.2d 57, 61, 239 P.3d 573 (2010).

If a search or seizure is made without a warrant, the State must show by clear and convincing evidence that the search or seizure falls into one of the "'few jealously and carefully drawn exceptions to the warrant requirement . . . .'" *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009) (quoting *Duncan*, 146 Wn.2d at 171). Consent is one such exception that requires the State to show consent to search is voluntary, the

10

consenting party has authority to consent, and the search does not exceed the scope of the consent. *State v. Reichenbach*, 153 Wn.2d 126, 131, 101 P.3d 80 (2004). If no exception applies, evidence derived from the illegal search or seizure must be suppressed under the exclusionary rule. *State v. Mayfield*, 192 Wn.2d 871, 883-84, 434 P.3d 58 (2019).

The exclusionary rule itself has exceptions that permit the admission of evidence even in the wake of official misconduct. *Id.* at 886. Washington's exclusionary rule is much broader than the federal rule, however, and our Supreme Court has rejected many of the exceptions recognized by the United States Supreme Court. *Id.* at 886-88 (listing rejected federal exceptions and noting that Washington's exclusionary rule has "no exceptions that rely on speculation, the likelihood of deterrence, or the reasonableness of official misconduct"). The only federally recognized exceptions to the exclusionary rule that Washington has also expressly recognized are the independent source doctrine and the attenuation doctrine, the latter on extremely narrow grounds. *Id.* at 889, 895-96.

The independent source doctrine permits the admission of "evidence tainted by unlawful governmental action . . . provided that it ultimately is obtained pursuant to a valid warrant or other lawful means independent of the unlawful action." *Gaines*, 154 Wn.2d at 718. Washington's attenuation doctrine, by contrast, operates on the same principles as proximate cause in tort law: the connection between the unlawful

governmental action and the discovery of the evidence is "'so attenuated as to dissipate the taint.'" *Mayfield*, 192 Wn.2d at 892 (quoting *Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939)). Evidence is admissible under the attenuation doctrine only if an "unforeseeable intervening act genuinely severs the causal connection between official misconduct and the discovery of evidence." *Id.* at 898.

### *Whether a search occurred*

The State argues for the first time on appeal that the deputies' entry into the house was not a search within the meaning of article I, section 7 and the Fourth Amendment. We disagree.

The State relies on *State v. Khounvichai*, 149 Wn.2d 557, 566, 69 P.3d 862 (2003), in which our Supreme Court held *Ferrier*[3] warnings are not required to enter a residence to question a suspect or for other legitimate, nonsearch investigatory purposes. There, the police suspected the resident's grandson of malicious mischief, and she gave consent— without *Ferrier* warnings—for the police to enter and speak to her grandson. *Id.* at 559. In the course of questioning the grandson, the police saw the defendant in possession of cocaine in plain view. *Id.* at 560. The defendant sought to suppress the evidence because the resident did not give informed consent to the search of her home, but the court held

---

[3] *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998).

that "*Ferrier* warnings were not required because the officers did not enter for the purpose of obtaining consent to a warrantless search." *Id.* at 566-67.

While the State asserts the deputies entered Ms. Morris's house to question Mr. Thompson, not conduct a search, this is not borne out by the record. The superior court found at the suppression hearing that Ms. Morris "gave consent to go into the residence to search for Mr. Thompson." CP at 89. Ms. Morris similarly testified at trial she had denied Mr. Thompson was home but gave officers consent to enter the house to search for him. While the deputies may have ultimately wished to question Mr. Thompson, their first objective in entering the home was to find him. Accordingly, we decline to reclassify the entry into Ms. Morris's home as anything other than a search.

### *Application of the exclusionary rule*

Mr. Thompson argues the superior court erred by failing to suppress evidence gained from the search of the home, namely, the observations of Mr. Thompson's flushed face and his statements he had ridden a snowmobile earlier that night.[4] He argues that Washington's narrow version of the attenuation doctrine does not provide an exception to the exclusionary rule because Ms. Morris's consent to search the house was not an

---

[4] Mr. Thompson does not take issue with the admission of the deputies' exculpatory observations about his snow boots.

13

unforeseeable superseding cause.

The superior court, however, never considered the attenuation doctrine in admitting the evidence. In its initial suppression ruling, the court considered solely whether the consent exception to the warrant requirement applied to the facts of the case. It found the State did not meet its burden to establish consent to search the backyard and concluded it was an illegal search. Applying the exclusionary rule, it further concluded the illegal search of the backyard tainted Ms. Morris's later informed consent to search the house. After the State raised the independent source doctrine on reconsideration, however, the court concluded that the doctrine provided an exception to the exclusionary rule that permitted admission of the evidence from the home.

Mr. Thompson nonetheless attempts to frame this as an attenuation issue, asserting the superior court held "Ms. Morris's consent to search broke the causal chain between the deputies' illegal behavior and the evidence discovered in the house." Br. of Appellant at 23. This misstates the court's ruling. The superior court in fact concluded there was "no causal connection between the initial search of the yard and the search of the house" and that "consent to search the house was gained from independent evidence outside of the illegal search of the yard." CP at 102. The court never held the causal chain was broken by the consent; it simply concluded there was no causal link in the first place.

14

Due to his reliance on the attenuation doctrine, Mr. Thompson fails to explain why the independent source doctrine *does not* permit the admission of the evidence obtained in the home. He did not address the issue below at the suppression hearing and he does not address it on appeal. For this reason, neither do we.

Despite the court's reliance on the independent source doctrine to admit the evidence, Mr. Thompson advances additional arguments to exclude the evidence that relies on the attenuation doctrine. We address these arguments in turn.

> *Whether informed consent to search triggers an analysis under the attenuation doctrine*

In a footnote, Mr. Thompson acknowledges that the superior court's suppression decision was based on the independent source doctrine, but appears to argue that the *Mayfield* court created a bright-line rule: cases involving subsequent informed consent are analyzed under the attenuation doctrine, while cases involving a subsequent valid warrant are analyzed under the independent source doctrine. This distinction is unsupported by any authority and ignores the rationale underlying each exception to the exclusionary rule. The relevant inquiry is how the legal and illegal search or seizure are causally connected, not on what basis the legal search or seizure was conducted, as the *Mayfield* court makes clear.

While *Mayfield* involved the defendant's informed consent to a search after being illegally seized, the court's analysis turned on the fact that there was no basis for the search independent of the initial misconduct. There, the arresting officer unlawfully seized the defendant without reasonable suspicion he had committed a crime. *Mayfield*, 192 Wn.2d at 876-77. While seized, the defendant consented to a pat-down search, during which the officer found a large amount of cash that the officer suspected resulted from drug transactions. *Id.* at 876. The officer then obtained informed consent including *Ferrier* warnings to search the defendant's vehicle, where he found methamphetamine. *Id.* The officer's requests to search therefore would not have occurred but for the initial illegal seizure and there was a direct causal link between the illegal seizure and the searches. *Id.* at 899-900.

Accordingly, our Supreme Court analyzed whether the defendant's informed consent to the search broke the causal link from the initial illegal seizure. It concluded that the defendant's consent "was the direct, foreseeable result of" the illegal seizure. *Id.* at 900. The court noted the inherently coercive nature of the request to search when the officer requesting the search and delivering *Ferrier* warnings is at the same time "subjecting the person to an ongoing unlawful seizure." *Id.* at 901. It further concluded that "consent to search during an ongoing unlawful seizure, even if preceded by *Ferrier*

16

warnings, is entirely foreseeable and not an independent act of free will" sufficient to break the chain of causation and satisfy Washington's narrow attenuation doctrine. *Id.*

Mr. Thompson's situation is readily distinguishable from that of the defendant in *Mayfield*. Here, the deputies had a lawful basis for requesting consent independent of the unlawful search of the backyard. They had followed the snowmobile's tracks to the house and even observed the snowmobile in the backyard from a lawful vantage point outside the property. They already knew the snowmobile had been recently driven and covered. The evidence gained from the backyard search—that the snowmobile was still warm—was not the proximate cause of the request to search the home for Mr. Thompson. Indeed, it is arguably not even a "but for" cause of the request. Based on the visual identification of the stolen snowmobile in the backyard, the deputies' logical next step in their investigation would have been to search for Mr. Thompson regardless of the heat of the snowmobile.

*Whether deputies relied on the unlawful search of the backyard*

Mr. Thompson next argues that the State failed to prove that the deputies did not rely on the warmth of the snowmobile to obtain Ms. Morris's consent to search the house or to elicit Mr. Thompson's statements inside the house and the evidence must be suppressed. His cited authority, however, involves a causal chain between the

17

misconduct and the evidence in question under the attenuation doctrine. Mr. Thompson

provides no authority to support a requirement under the independent source doctrine that

the lawful means of obtaining evidence be insulated from the unlawful action.

To the contrary, Washington courts routinely admit evidence under the

independent source doctrine that is arguably tainted by an illegal search. The *Mayfield*

court noted that in independent source cases, the evidence can be admissible even if

official misconduct is a "but for" cause of the discovery of evidence. *Id.* at 889. And our

Supreme Court's pivotal independent source cases involve search warrants based on

illegally obtained evidence that the court nonetheless found valid for admitting that same

evidence.

In *Gaines*, after lawfully searching the passenger cabin of a vehicle incident to

arrest, a police officer unlawfully looked into the trunk of the vehicle and saw an assault

rifle and ammunition. 154 Wn.2d at 714, 717. He closed the trunk without disturbing the

contents and the vehicle was impounded, but his observation was included in another

officer's affidavit in support of a search warrant for the car. *Id.* at 714-15. The rifle and

ammunition were seized pursuant to that warrant. *Id.* at 715. The court found that the

remaining facts in the affidavit would have constituted probable cause even without the

18

illegally obtained information about the rifle and ammunition and found the items were

properly admitted as evidence. *Id.* at 718.

In *State v. Coates*, 107 Wn.2d 882, 884, 735 P.2d 64 (1987), a detective

questioned the defendant about the location of a knife used in an assault, unaware that the

defendant had previously invoked his right to silence. The defendant told him the knife's

location in his car, which had already been impounded, and the detective obtained a

search warrant based in part on the defendant's statement. *Id.* at 884-85. The knife was

found during the search of the vehicle. *Id.* at 885. The court found that even though the

defendant's illegally obtained statements were included, the remaining facts in the

affidavit were enough probable cause to support the warrant and thus found the knife was

properly admitted as evidence. *Id.* at 888-89.

We have held similarly in a nonwarrant independent source case. In *State v.

Hilton*, 164 Wn. App. 81, 85, 261 P.3d 683 (2011), a couple was murdered with an

uncommon caliber of bullet. The police began investigating local gun shops to see which

sold the ammunition and to whom. *Id.* Other investigative avenues implicated the

defendant and his apartment was searched pursuant to a search warrant, which we later

held was invalid. *Id*. at 86. In the defendant's apartment, police located a sales receipt

for the uncommon ammunition and used shell casings that matched the bullets used to kill

the victims. *Id.* While the sales receipt and the shell casings were suppressed because of the invalid warrant, the owner of the gun shop was permitted to testify and introduce her sales records at trial. *Id.* at 88. We held it was proper to admit the evidence under the independent source doctrine because a detective was already tracing the ammunition and continued to do so after the search of the defendant's apartment. *Id.* at 92. We noted that the detective was not "simply exploiting information" from the illegal search, but instead "was thoroughly pursuing a lead first developed at the murder scene." *Id.* at 91. We did not require a showing that the State did not rely on the sales receipt and the shell casings in pursuing that lead.

These cases reaffirm that the relevant question for the independent source doctrine is not whether improperly obtained evidence is so far removed from the evidence at issue as to dissipate any taint, but rather whether there was sufficient properly obtained evidence to independently justify the search or seizure. Here, it is undisputed that police lawfully tracked the snowmobile and observed it in Ms. Morris's backyard. Entering Ms. Morris's home to search for Mr. Thompson is the logical result of the deputies' thorough pursuit of this lead.

INSUFFICIENT EVIDENCE OF SNOWMOBILE MODEL YEARS

Mr. Thompson argues the State presented insufficient evidence to convict him for either count of possession of a stolen motor vehicle. In making this argument, he relies on the law of the case doctrine, on the jury instruction that required the State to prove the model number of the snowmobiles, and the lack of this evidence in the record. The State concedes that both convictions must be reversed and the charges dismissed. For the reasons explained below, we accept the State's concession.

The due process clauses of both the federal and state constitutions require the State to prove each element of a crime beyond a reasonable doubt. U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3; *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). When analyzing whether the State presented sufficient evidence to meet this burden, Washington courts look to the "law of the case" that is established by the trial court's instructions to the jury. *State v. Johnson*, 188 Wn.2d 742, 755, 399 P.3d 507 (2017). If the State does not object to the inclusion of an "otherwise unnecessary element[ ] of the offense" in the jury's to-convict instruction, the State assumes the burden of proving that additional element beyond a reasonable doubt. *Id.* at 756 (quoting *State v. Hickman*, 135 Wn.2d 97, 102, 954 P.2d 900 (1998)).

21

Here, the to-convict instructions on both charges of possession of a stolen motor vehicle included the otherwise unnecessary element of the snowmobile's model years. The State thus assumed the burden to prove the model years of the stolen snowmobiles under the law of the case doctrine. It failed to present any evidence on this element of the offenses, however, and accordingly did not meet its burden. The evidence was therefore insufficient to support Mr. Thompson's two convictions for possession of a stolen motor vehicle. The convictions must be reversed and the charges dismissed. *See Hickman*, 135 Wn.2d at 106.

Under the law of the case doctrine, the State had the burden to prove the snowmobile model years in the jury to-convict instructions for possession of a stolen motor vehicle. Because it presented no evidence of the model years, the State failed to prove every element of the crime beyond a reasonable doubt, and the convictions must be reversed and dismissed.

VACATION OF POSSESSION OF CONTROLLED SUBSTANCE CONVICTION

Mr. Thompson argues that his drug possession conviction must be reversed and the charge dismissed because the criminal statute unconstitutionally criminalizes innocent conduct. The State concedes this issue.

22

No. 37375-4-III
*State v. Thompson*

In *State v. Blake*, 197 Wn.2d 170, 195, 481 P.3d 521 (2021), our Supreme Court held that Washington's simple drug possession statute, RCW 69.50.4013, violated the right to due process under the State and federal constitutions because it did not require the State to prove a defendant acted with a culpable mental state. A conviction based on an unconstitutional statute must be vacated. *State v. LaBounty*, 17 Wn. App. 2d 576, 581, 487 P.3d 221 (2021). We therefore reverse Thompson's drug possession conviction and remand for resentencing.

Affirmed in part and remanded for resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Pennell, C.J.

Fearing, J.

23