IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                                      Respondent,<br><br>          v.<br><br>SHAMARR DERRICK PARKER,<br><br>                                      Appellant. | No. 82049-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUN, J. — In 2008, 17-year-old A.W. arrived home late and told her mother that a stranger had raped her. A.W.'s mother called 911. The police identified Shamarr Parker as a suspect, located him using a cell site simulator (CSS), and arrested him. The State charged Parker with first degree kidnapping, first degree robbery, and first degree rape, all with a deadly weapon. A jury found Parker guilty of kidnapping and robbery but deadlocked on the rape charge. Parker filed a successful personal restraint petition and obtained a retrial.

Before the second trial, Parker learned that the police used a CSS to locate him despite not disclosing it in their warrant application. Parker moved to dismiss the case based on government misconduct and, in the alternative, to suppress evidence. The trial court denied the motions.

At the second trial, over Parker's objections, the court admitted (1) a 911 call, (2) A.W.'s mother's testimony, and (3) the testimony of a sexual assault

Citations and pin cites are based on the Westlaw online version of the cited material.

nurse examiner (SANE).  A jury found Parker guilty of kidnapping and robbery and not guilty of rape.  The trial court found Parker indigent but imposed legal financial obligations (LFOs).

Given our Supreme Court's decision in State v. Mayfield, 192 Wn.2d 871, 434 P.3d 58 (2019)—which issued after the second trial—we remand for the trial court to hold a suppression hearing on the issue of attenuation with respect to the CSS.  In the event Parker's convictions stand, we also remand to strike a $200 filing fee and an interest accrual provision.  We otherwise affirm.

## I. BACKGROUND

In December 2008, 17-year-old A.W. arrived home late and told her mother, Tracy Nephew,[1] that a stranger had raped her at knifepoint.  Nephew called 911.  A.W. went to the hospital and a SANE examined her.

Police identified Parker as a suspect based on A.W.'s recollection of the alleged attacker's car and license plate number.  Pierce County Superior Court issued an arrest warrant for Parker.  Also, police obtained a search warrant to use a pen register and trap and trace device to locate Parker.  They also used a CSS, which they had not disclosed in their warrant application.  Police found Parker at the home of Dacia Birka, an ex-girlfriend with whom Parker shared a child.  When Parker left the residence with Birka, police followed them and arrested Parker in a parking lot.

The State charged Parker with first degree kidnapping, first degree robbery, and first degree rape, all with a deadly weapon.  A jury found Parker

---

[1] Tracy Nephew's name was Tracy Miller at the time of the first trial.

guilty of first degree kidnapping and first degree robbery both with a deadly weapon. The jury deadlocked on the rape charge.

Parker appealed based on sufficiency of the evidence on the kidnapping conviction. Division Two of this court affirmed. Parker then filed a personal restraint petition based on prosecutorial misconduct during the trial and ineffective assistance of counsel during his appeal. Division Two granted the petition, reversed his convictions, and remanded for a new trial.

The State again charged Parker with first degree kidnapping, first degree robbery, and first degree rape, all with a deadly weapon.

Before the second trial, Parker discovered that the police had used a CSS, commonly known as a Stingray, to locate him before his arrest, despite not mentioning its use in their warrant application. Parker moved for dismissal under CrR 8.3(b) and, in the alternative, suppression of evidence discovered as a result of the search. The trial court denied the motions.

At the second trial, A.W. testified that Parker forced her into his car at knifepoint, drove her to another location, robbed her of some marijuana and cash, and raped her.

Parker did not testify. He presented a defense theory that A.W. met him voluntarily to sell him marijuana, and that he robbed her but did not kidnap or rape her. Parker contended that A.W. alleged rape and kidnapping as revenge for the robbery and to avoid trouble for arriving home late and being with her older boyfriend.

A.W. denied knowing Parker before the attack and denied voluntarily

3

meeting him to sell him drugs. Over the course of trial, A.W. admitted in her testimony that she had not been truthful at first and had omitted information on certain occasions. Just after the incident, she told her mother she was with friends rather than her boyfriend that day. She at first told no one that she had sex with her boyfriend that day and she acknowledged that she answered falsely when the SANE asked her when she had last had sex. And she initially told no one that she possessed marijuana or that Parker stole it from her. Also, A.W. initially told people and testified that no one would lend her their phone after the attack, but during cross-examination she admitted that someone had lent her their phone and that she called her boyfriend, and her boyfriend testified that she called him that day.

A.W.'s mother, Nephew, and the SANE also testified. Birka, Parker's ex-girlfriend, was unavailable, so the State introduced her testimony from the first trial.

The jury found Parker guilty of first degree kidnapping and first degree robbery, both with a deadly weapon. The jury found him not guilty of first degree rape. The court found Parker indigent yet imposed a $200 filing fee and interest.

## II. ANALYSIS

### A. Denial of Motion to Dismiss Under CrR 8.3(b)

Parker says that the trial court erred in denying his CrR 8.3(b) motion to dismiss because the police committed misconduct by omitting the CSS from the warrant application. The State responds that the police did not commit misconduct and that, even if misconduct occurred, it did not prejudice Parker.

4

We conclude that the trial court acted within its discretion in denying Parker's motion because he has not established actual prejudice.

We review a trial court's decision on a motion to dismiss under CrR 8.3(b) for abuse of discretion. State v. Koeller, 15 Wn. App. 2d 245, 251, 477 P.3d 61 (2020). "A court abuses its discretion where its decision rests on untenable grounds or was made for untenable reasons." Id.

CrR 8.3(b) provides that a "court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." Thus, a movant must show by a preponderance of the evidence (1) arbitrary action or misconduct by the government, and (2) prejudice affecting the movant's right to a fair trial. Koeller, 15 Wn. App. 2d at 251; State v. Kone, 165 Wn. App. 420, 432–33, 266 P.3d 916 (2011). Dismissal under CrR 8.3(b) is an "'extraordinary remedy'" and should be granted "'only as a last resort.'" Koeller, 15 Wn. App. 2d at 251 (quoting State v. Brooks, 149 Wn. App. 373, 384, 203 P.3d 397 (2009); see also State v. Oppelt, 172 Wn.2d 285, 297–98, 257 P.3d 653 (2011) ("Like the due process balancing test, even where a defendant shows some actual prejudice and State misconduct, the judge may in [their] discretion refuse to dismiss under CrR 8.3(b) if the actual prejudice is slight and the misconduct is not too egregious.").

In moving for dismissal under CrR 8.3(b), "[t]he movant . . . bears the burden of demonstrating prejudice." State v. Salgado-Mendoza, 189 Wn.2d 420,

431, 403 P.3d 45 (2017).  "[T]he defendant must show actual prejudice, not merely speculative prejudice, affected [their] right to a fair trial."  Kone, 165 Wn. App. at 433; see also Salgado-Mendoza, 189 Wn.2d at 431–32 ("Our case law makes clear that a party cannot meet this burden by generally alleging prejudice to [their] fair trial rights").  A defendant does not establish prejudice by showing merely "expense, inconvenience, or additional delay within the speedy trial period; the misconduct must interfere with the defendant's ability to present [their] case."  City of Kent v. Sandhu, 159 Wn. App. 836, 841, 247 P.3d 454 (2011).  And dismissal "should be limited to egregious cases of mismanagement or misconduct."  State v. Hand, 199 Wn. App. 887, 898, 401 P.3d 367 (2017).

Pierce County Superior Court issued a bench warrant for Parker's arrest. Police obtained a cell phone number from Parker's mother that they suspected to be his number.  To locate Parker, the police applied for a warrant under the Washington State Criminal Records Privacy Act[2] to place a pen register and a trap and trace device on the cell phone number.  A pen register identifies the numbers dialed by the specified phone number and a trap and trace identifies the phone numbers of incoming calls to the specified phone number. RCW 9.73.260(d), (e).  In the warrant application, the police also said that they wanted the court to order the cell service provider, T-Mobile, to share the general geographic location of Parker's cell phone by identifying the cell tower connected to the phone.  The police, however, did not say anything about the use of a CSS

---

[2] Chapter 10.97 RCW.

6

in the application. The trial court issued an order[3] approving the use of a pen register and trap and trace device and the discovery of Parker's location through T-Mobile. The court sealed the warrant application and warrant.

According to the police report, officers identified Birka's address as a location where Parker may be hiding. Police surveilled the residence. Police say they used a CSS to confirm that Parker's phone, and thus presumably Parker himself, was in the residence. A CSS makes cell phones in its vicinity connect to it rather than the nearest cell tower and therefore provides real-time, geographic locations on all switched-on cell phones in the area, as well as access to data and identifying information. RCW 9.73.260(f); see also People v. Gordon, 58 Misc. 3d 544, 549–50, 68 N.Y.S.3d 306, 310 (N.Y. Sup. Ct. 2017) ("Documents in the public domain suggest that Stingrays can obtain and record a wide array of data from an individual's cell phone, including highly precise real-time cell phone location and the contents of voice and text communications."). Once Parker and Birka left the residence, police followed them and arrested Parker in public.

Throughout the first trial, the defense, prosecution, and trial court did not know that the police had used a CSS to locate Parker. After Parker's failed direct appeal, an investigatory news story revealed the use of CSSs in police investigations. See Kate Martin, Tacoma Police Using Surveillance Device to Sweep up Cellphone Data, TACOMA NEWS TRIB. (last updated Feb. 25, 2016 9:41 PM) https://www.thenewstribune.com/news/local/article25878184.html

---

[3] "A court order may function as a warrant so long as it meets constitutional requirements." State v. Garcia-Salgado, 170 Wn.2d 176, 186, 240 P.3d 153 (2010). Parker does not dispute the validity of this order.

[https://perma.cc/HM36-WR56].  Pierce County Superior Court unsealed warrants for cases in which police used a CSS, including Parker's case.  Parker did not know about the use of the CSS until after his personal restraint petition succeeded.  In 2015, the legislature amended RCW 9.73.260 to include the use of a CSS as an action for which law enforcement needs a warrant.  RCW 9.73.260(2).

Before the second trial, Parker moved to dismiss the case under CrR 8.3(b), saying that the police officers' use of the CSS after failing to disclose it in the warrant application was government misconduct justifying dismissal.  The trial court held a hearing on the issue and expressed concern about the police officers' lack of candor and that the search was wider than the warrant anticipated and affected more people's privacy than just Parker's.  But the court stated that to "have police officers held accountable and exclude evidence or dismiss a case eight years later because of what we know now and the law developed at this point does not serve justice at all."[4]  The court ultimately denied the motion.

Because Parker failed to establish prejudice, the trial court acted within its discretion in denying dismissal.  Parker told the trial court that he should not have to show prejudice, and on appeal, he makes only a conclusory statement that his

---

[4] Parker says that the trial court improperly based its decision on a "good faith" theory, but as the State correctly notes, that doctrine is an exception to the exclusionary rule, which is not at issue.  See State v. Afana, 169 Wn.2d 169, 184, 233 P.3d 879 (2010) (J.M. Johnson, J., concurring).  Here, in addressing the motion to dismiss, the trial court was apparently noting the officers' intent and understanding of the law when they applied for the warrant to assess the alleged misconduct.

right to a fundamentally fair proceeding was prejudiced because he was deprived of knowledge about the use of the CSS during his first trial, appeal, and personal restraint petition.

Given that dismissal is a "last resort" and the trial court had a chance to suppress evidence rather than dismiss the case outright, the trial court acted within its discretion in denying Parker's CrR 8.3(b) motion to dismiss.[5]  See State v. Wilson, 149 Wn.2d 1, 12, 65 P.3d 657 (2003) (noting that the trial court ignored "intermediate remedial steps," such as excluding testimony, before resorting to dismissal (quoting State v. Koerber, 85 Wn. App. 1, 4, 931 P.2d 904 (1996))); Koeller, 15 Wn. App. 2d at 251.

### B.  Denial of Motion to Suppress

Parker says that the trial court erred in denying his motion to suppress evidence in several ways.[6]  He contends that the use of the CSS was an unlawful

---

[5] The State also says that the trial court properly denied the motion to dismiss the case for "extreme and outrageous" conduct by the officers.  Parker does mention the words "extreme and outrageous" in an assignment of error but makes no argument that the trial court should have dismissed the case as such.  He makes only a CrR 8.3(b) dismissal argument.  Thus, we do not address this issue.  See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (courts need not address a claim unsupported by argument).

[6] Parker says the trial court applied the good faith exception to the suppression motion and that the doctrine does not apply under Washington law.  But the trial court merely stated:

> In part, it is 2010 and exactly how well developed the law was at that time, wasn't very well developed in this particular area, and have police officers held accountable and exclude evidence or dismiss a case eight years later because of what we know now and the law developed at this point does not serve justice at all.  I submit to you does not.  I will not dismiss the case.

The trial court was clearly addressing the motion to dismiss and not the motion to suppress.

Parker also says the trial court erred by denying his request for a Franks hearing.  See Franks v. Delaware, 438 U.S. 154, 164, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).  But a Franks hearing is required only when the probable cause underlying the warrant is

search and that the trial court should have suppressed "evidence from Birka" as fruit of the poisonous tree. The State counters that no unlawful conduct occurred, and even if it did, the evidence was sufficiently attenuated to support denial of the suppression motion.[7] In light of Mayfield, we remand for a suppression hearing to address attenuation.

When reviewing a trial court's denial of a motion to suppress, we review whether substantial evidence supports challenged findings of fact and whether the findings support the conclusions of law. State v. Ward, 182 Wn. App. 574, 587, 330 P.3d 203 (2014). We "review conclusions of law relating to the suppression of evidence de novo." State v. Betancourth, 190 Wn.2d 357, 363, 413 P.3d 566 (2018).

---

in dispute. State v. O'Neal, 126 Wn. App. 395, 410, 109 P.3d 429 (2005), aff'd, 159 Wn.2d 500, 150 P.3d 1121 (2007) (requiring a Franks hearing when the defendant makes a preliminary showing that an officer made a false statement in applying for a warrant and the "false statement was necessary to a finding of probable cause"). The trial court did not err because any false statement by the officers about use of the CSS was not "necessary to a finding of probable cause." Id.

[7] Parker highlights that the trial court did not enter required written findings of fact and conclusions of law. Under CrR 3.6(a), if a party moves to suppress evidence, the trial court must decide whether to hold an evidentiary hearing. If it holds a hearing, it must enter written findings of fact and conclusions of law. CrR 3.6(b). If it decides not to hold a hearing, it must "enter a written order setting forth its reasons." CrR 3.6(a). Parker did not specifically invoke CrR 3.6 in his motion to suppress. But given that the basis for his motion was constitutional, the motion sought suppression within the scope of CrR 3.6. 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 103.3 (6th ed. 2016) ("Likewise, a motion in limine should be distinguished from a motion in a criminal case to suppress evidence on constitutional grounds."). The trial court did not hold a CrR 3.6 hearing on the motion and did not explain why in writing. But as we are remanding for a suppression hearing, we need not address this issue further.

1. Scope of warrant

We review de novo whether a search violated article I, section 7[8] of the Washington State Constitution. State v. Witkowski, 3 Wn. App. 2d 318, 324, 415 P.3d 639 (2018) (Sutton, J., concurring).

Article I, section 7 provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." The use of a CSS to locate someone's phone inside a residence is a search under article I, section 7, which requires a warrant. See State v. Muhammad, 194 Wn.2d 577, 584, 451 P.3d 1060 (2019) ("Individuals have a constitutional privacy right to their cell phone location data"). We note that in 2015, the legislature amended RCW 9.73.260 to include the use of a CSS as an action for which law enforcement needs a warrant. RCW 9.73.260(2). Police must stay "strictly within the scope" of a search warrant when executing it. Witkowski, 3 Wn. App. 2d at 325. And we assess warrants in a "commonsense, practical manner, not in a hypertechnical sense." Id.

A CSS differs functionally from a trap and trace device or a pen register. A CSS provides real-time location information about any switched-on cell phone in the area. It can also pinpoint more precisely the location of a cell phone compared to identifying the location of the cell tower connected to a phone. Through the warrant, the court approved the use of a pen register and a trap and trace and permitted the discovery of the closest cell tower connected to Parker's

---

[8] In this section, we address only article I, section 7 because it is "more protective than the Fourth Amendment in the search and seizure context." State v. Eserjose, 171 Wn.2d 907, 913, 259 P.3d 172 (2011).

phone.

The State says that the officers referenced the most functionally similar technology—the trap and trace device—that the Privacy Act addressed at the time of the warrant application, and the warrant approved finding Parker's location, so the search was proper. But the lack of a statutory definition for a CSS did not prevent the officers from seeking a search warrant for the use of one.

The State also says that police officers have discretion in deciding how to execute a search warrant. But they must still stay within the scope of the warrant. See Witkowski, 3 Wn. App. 2d at 325.

A commonsense reading of the warrant shows that use of a CSS falls outside of its scope.[9] The warrant authorized use of a pen register and trap and trace device and permitted the discovery of the general geographic location of Parker's cell phone. A CSS is more precise and more invasive than the devices the warrant allows; its use reveals information about the inside of a home, namely the presence of the targeted cell phone. The officers exceeded the scope of the search warrant by using a CSS and this conduct violated article I,

---

[9] In United States v. Lambis, 197 F. Supp. 3d 606 (S.D.N.Y. 2016), the court held under the Fourth Amendment to the United States Constitution that a warrant for a pen register device and cell site location information (CSLI) did not authorize officers to use a CSS to locate the defendant. Id. at 611. The court noted that a CSS provides more precise location data than CSLI, which shows only an approximate location of the cell phone's past use. Id. at 608–09, 611. And Article I, section 7 is more protective of privacy rights than the Fourth Amendment. See Eserjose, 171 Wn.2d at 913.

In State v. Andrews, 227 Md. App. 350, 376–77, 134 A.3d 324 (2016), the court noted that a CSS—able to obtain active real-time location information—is "far different" from a pen register or a trap and trace device and held that a warrant for the latter two devices did not authorize the use of a CSS.

section 7.[10] We thus next address whether the attenuation doctrine allows for the admission of Birka's testimony.

2.      Attenuation doctrine

Parker says the trial court erred by admitting the evidence under the attenuation doctrine. Citing Mayfield, which issued after his second trial and which rejects the broad federal attenuation doctrine, he says that the trial court should have suppressed Birka's testimony.[11] He seeks reversal on this ground. In the alternative, Parker requests that we remand for development of the record on attenuation given the narrower standard from Mayfield. The State says that Mayfield does not affect the admissibility of a third party's voluntary testimony. We remand as Parker requests.

Preliminarily, Parker does not identify specifically which evidence he seeks to suppress. In his motion to suppress, he identified Birka's testimony and his DNA. In its brief on appeal, the State addressed Birka's testimony, Parker's DNA, and Parker's jacket, which Birka gave to the police. On appeal, Parker

---

[10] Parker says the trial court erred by determining that he had a diminished expectation of privacy based on his arrest and Department of Corrections (DOC) warrants. The trial court correctly concluded that Parker had a reduced expectation of privacy given his DOC warrant, see State v. Winterstein, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009) (holding that those under community supervision have a lesser expectation of privacy); Secretary's Warrants, WASH. DEP'T OF CORRECTIONS (showing that the DOC can issue arrest warrants for individuals who violate conditions of community custody), https://www.doc.wa.gov/information/warrants/default.htm [https://perma.cc/MG8K-ADYA]. But we have found no law supporting the proposition that an arrest warrant reduces an individual's expectation of privacy. In any event, as discussed above, we conclude that the police exceeded the warrant's scope.

[11] Mayfield applies here because Parker's case is not yet final. See State v. Wences, 189 Wn.2d 675, 677, 406 P.3d 267 (2017) ("[a] new rule for the conduct of criminal prosecutions is to be applied . . . to all cases, state or federal, pending on direct review or not yet final." (alteration in original) (quoting In re Pers. Restraint of St. Pierre, 118 Wn.2d 321, 326, 823 P.2d 492 (1992))).

simply seeks to exclude "evidence from Birka and her testimony." Because he did not seek to suppress the jacket below, he waived that argument. See RAP 2.5 (an "appellate court may refuse to review any claim of error which was not raised in the trial court"). And because Parker does not mention his DNA on appeal, we assess only whether the trial court erred in admitting Birka's testimony.

The fruit of the poisonous tree doctrine requires the suppression of both physical and verbal evidence resulting from an unconstitutional search.[12] State v. Perez, 5 Wn. App. 2d 867, 881, 428 P.3d 1251, review granted, cause remanded, 193 Wn.2d 1008, 439 P.3d 1075 (2019). The attenuation doctrine serves as an exception to that requirement. See Mayfield, 192 Wn.2d at 874.

After Parker's second trial, our Supreme Court rejected the broad federal attenuation doctrine and held that "the attenuation doctrine must be narrow and apply only where intervening circumstances have genuinely severed the causal connection between official misconduct and the discovery of evidence." Id. at 874–75. Before Mayfield, the application of the attenuation doctrine as a matter of state constitutional law was an open question. Id. at 882. Mayfield relies on the principle that "the primary purpose of Washington's exclusionary rule is *not* to

---

[12] Citing State v. Hilton, 164 Wn. App. 81, 261 P.3d 683 (2011), the State says that the exclusionary rule does not apply to the testimony of third parties even if their identities are discovered as a result of an illegal search. There, Division Three of this court said, "Typically, the testimony of a witness whose identity is discovered through a constitutional violation is not suppressed; the free will of the witness attenuates any taint that led to the discovery of the witness." Id. at 89. But it did not announce a categorical rule and the case predates Mayfield. Also, neither the trial court nor the parties developed the record regarding Birka's free will.

deter official misconduct under threat of suppression" as the federal rule does, but to "protect the individual right to privacy and to provide a certain remedy when that right is violated." Id. The court held that the state's narrow attenuation doctrine requires the State to

> prove that unforeseen intervening circumstances genuinely severed the causal connection between official misconduct and the discovery of evidence. The State cannot meet its burden by merely showing that there are one or more *additional* proximate causes of the discovery of evidence. The question of whether intervening circumstances constitute a superseding cause is a highly fact-specific inquiry that must account for the totality of the circumstances, just as it is in the context of tort law.

Id. at 898. The court noted that "unforeseeable acts of independent free will" may constitute a sufficient "intervening circumstance." Id. at 892, 895 (noting that under the historical version of the federal attenuation doctrine "unforeseeable acts of independent free will" were sufficient and stating that the historical version may be compatible with article I, section 7).

An appellate court may remand for a trial court to hold a suppression hearing based on new case law. For example, in State v. Robinson, our Supreme Court remanded two cases to the trial court for suppression hearings, noting that the State had not had the incentive to fully develop the records in light of new case law. 171 Wn.2d 292, 307, 253 P.3d 84 (2011). The court stated:

> At these hearings, both the State and the petitioners will be permitted to further develop the record. If the trial court finds that the evidence was admissible, the conviction stands affirmed. If, on the other hand, the trial court finds the evidence was inadmissible, it must then determine whether the remaining evidence was sufficient to uphold the conviction. If so, the conviction is affirmed. If not, the conviction is reversed.

Id.

The only information in the record about Birka's interactions with the police comes from police reports.  After the police used the CSS to locate Parker, they watched him leave Birka's residence and drive away with her.  The police stopped the car and arrested Parker.  When the police stated they were arresting him for assault, Birka said, "[Y]ou mean a rape."  This statement was not introduced at trial.  The police then asked Birka if she would speak with them and she told them to meet her at her home later that day.  She invited the police into her home and spoke with them.  During this visit, Birka did not tell the police about inculpatory statements that Parker had made to her.  Sixteen days later, Birka spoke with officers again.  The circumstances are unclear.  But Birka shared Parker's statements about robbing A.W.  She then testified at the first trial and the State introduced her testimony at the second trial.

 In denying Parker's motion to suppress, the trial court concluded that the contested evidence was attenuated.  The court noted that 16 days had elapsed between the contested search and the sharing of inculpatory statements.  And the court said that Birka was an "intervening personality" who was not the subject in this case.  As noted above, the court issued no findings of fact or conclusions of law.

The record does not suffice for us to assess attenuation under Mayfield. The trial court did not hold a CrR 3.6 hearing on the matter, the parties presented no testimony or other evidence, and the trial court did not enter any findings of fact in denying Parker's motion to suppress.  As in Robinson, the parties did not have the incentive to develop the record on the issue of whether an "unforeseen

intervening circumstance[] genuinely severed the causal connection between official misconduct and the discovery of evidence," because the Supreme Court had not yet decided Mayfield. Id. at 898. The only source of information in the record here is the police report. Cf. Mayfield, 192 Wn.2d at 899 (deciding the attenuation issue because the trial court's "findings of fact [were] sufficient for us to decide the issue as a matter of law.").

As the court in Mayfield noted, "[t]he question of whether intervening circumstances constitute a superseding cause is a highly fact-specific inquiry that must account for the totality of the circumstances." Id. at 898. In light of Mayfield, we choose a similar approach to the Robinson court and remand for a suppression hearing on the attenuation issue.

### C. Right to Present a Defense & Right to Confrontation

Parker says that the trial court violated his right to present a defense and right to confrontation when it did not allow him to ask a testifying officer about Parker's statements indicating knowledge of A.W.'s name. The State disputes this and says that the trial court merely limited how Parker could present that evidence. The State also says that the court did not violate Parker's right to confrontation because it permitted him to confront A.W. about her claim that she did not know Parker. We conclude that the exclusion of Parker's hearsay statements violated neither his right to present a defense nor his confrontation right.

Before trial, the State moved in limine to exclude Detective Graham's conversation with Parker shortly after the incident. In that exchange, Parker said:

17

"No. The girl, [A]. She got my number. I know she doesn't have a cellphone."
Parker objected, saying that knowing A.W.'s name at that time conflicted with
A.W.'s testimony and undermined her credibility. In granting the State's motion,
the trial court said that Parker could not introduce his own "self-serving" hearsay
statement through Detective Graham.[13] But the court said that Parker could
cross-examine A.W. about the matter and testify himself about knowing A.W.
before the incident. The court noted that allowing Parker to introduce his own
hearsay statement while avoiding being subject to cross-examination would lead
to the jury getting an incomplete picture. At trial, the parties revisited the issue
and the trial court maintained its prior ruling.

1. Right to present a defense

For claims of a violation of the right to present a defense, we "apply [a]
two-step review process to review the trial court's individual evidentiary rulings
for an abuse of discretion and to consider de novo the constitutional question of
whether these rulings deprived [the defendant] of [their] Sixth Amendment right to
present a defense." State v. Arndt, 194 Wn.2d 784, 797–98, 453 P.3d 696
(2019).

The Sixth Amendment to the United States Constitution guarantees a

---

[13] While Parker correctly notes that "self-serving hearsay" is not an independent
rule barring "admission of statements that would otherwise satisfy a hearsay rule
exception," he does not explain what hearsay exception would otherwise permit him to
introduce his own hearsay statement though the testimony of Detective Graham. See
State v. Pavlik, 165 Wn. App. 645, 650, 268 P.3d 986 (2011) ("'self-serving' seems to be
a shorthand way of saying that it was hearsay and did not fit into any of the recognized
exceptions to the hearsay rule" (quoting State v. King, 71 Wn.2d 573, 577, 429 P.2d 914
(1967))). Parker seems to suggest, but does not clearly argue, that the statement is not
hearsay.

criminal defendant the right to present a defense. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010); State v. Ward, 8 Wn. App. 2d 365, 370–71, 438 P.3d 588, review denied, 193 Wn.2d 1031, 447 P.3d 161 (2019). "'[I]n plain terms the right to present a defense [is] the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.'" Ward, 8 Wn. App. 2d at 371 (alteration in original) (quoting State v. Lizarraga, 191 Wn. App. 530, 552, 364 P.3d 810 (2015)).

      a. Review of evidentiary ruling for abuse of discretion

A trial court abuses its discretion in ruling on an evidentiary issue if "it makes a manifestly unreasonable decision or bases its decision on untenable grounds or reasons," including applying the wrong legal standard or relying on unsupported facts. State v. Cayetano-Jaimes, 190 Wn. App. 286, 295, 359 P.3d 919 (2015).

Under ER 801 and ER 802, out-of-court statements offered to prove the truth of the matter asserted are inadmissible hearsay unless they fall under an exception.

The trial court acted within its discretion by excluding as hearsay Parker's statement to Detective Graham. Parker's purpose for introducing the evidence was to prove that he and A.W. knew each other before the attack to advance the theory that A.W. met with him voluntarily. Parker offered his out-of-court statement for the truth of the matter asserted. And no exception to the hearsay rule applies.

2. De novo review of right to present a defense

Next, we conduct a constitutional analysis. State v. Jennings, 14 Wn. App. 2d 779, 789, 474 P.3d 599 (2020). As long as the evidence is relevant, courts balance "the State's interest in excluding the evidence . . . against the defendant's need for the information sought to be admitted." Arndt, 194 Wn.2d at 812. "To show a Sixth Amendment violation, the excluded evidence must be of extremely high probative value." State v. Case, 13 Wn. App. 2d 657, 670, 466 P.3d 799 (2020). Evidentiary exclusions violate the Sixth Amendment when the defendant's "entire defense" rests on the excluded evidence. Jones, 168 Wn.2d at 721. "The more the exclusion of defense evidence prejudiced the defendant, the more likely we will find a constitutional violation." State v. Burnam, 4 Wn. App. 2d 368, 375, 421 P.3d 977 (2018).

In Jones, the court held that the trial court violated the defendant's right to present a defense in a rape case when it did not allow him to testify or cross-examine witnesses about his claim that the alleged victim consented as part of a sex party. 168 Wn.2d at 721. The court noted that this evidence constituted Jones's "entire defense" and reversed. Id.

In Cayetano-Jaimes, the court held that the trial court violated the defendant's right to present a defense when it excluded telephonic testimony from the alleged victim's mother stating that she had never left her children in the defendant's care. 190 Wn. App. at 303. Quoting Jones, the court noted that the evidence would constitute his "entire defense" against the allegations of abuse. Id. at 300.

By contrast, in Jennings, the court held that the trial court did not violate the defendant's right to present a defense by excluding a toxicology report showing that the alleged victim was high on methamphetamines at the time of the shooting. 14 Wn. App. 2d at 792. Jennings wished to introduce the report to support his contention that he believed the alleged victim would act violently due to being on methamphetamines. Id. The court said that "the toxicology report did not have 'extremely high' probative value and it did not constitute Jennings's 'entire defense.'" Id. at 791 (quoting Jones, 168 Wn.2d at 721). The court noted that while the toxicology report corroborated Jennings's subjective belief that the alleged victim was on methamphetamines, it did not prevent him from testifying about his belief that the person was under the influence of drugs and thus presenting a defense that shooting was justified. Id.

Here, that Parker knew A.W.'s name is not a full defense to any of the charges. The statement at issue does not necessarily show that Parker and A.W. knew each other *before* the attack. And even if it did, that they knew each other would not constitute an entire defense to the charges. As in Jennings, while the hearsay statement corroborates that Parker knew A.W.'s name after the attack, it is not highly probative. And the trial court permitted Parker to cross-examine A.W. on the issue. The trial court did not violate Parker's right to present a defense.

3. Right to confrontation

We review de novo Sixth Amendment confrontation clause challenges. State v. Scanlan, 193 Wn.2d 753, 761, 445 P.3d 960 (2019), cert. denied, 140 S.

Ct. 834, 205 L. Ed. 2d 483 (2020).

The Sixth Amendment guarantees a criminal defendant the right to confront and cross-examine adverse witnesses. Ward, 8 Wn. App. 2d at 370–71. But the right to confrontation and cross-examination of adverse witness "is not absolute." State v. Darden, 145 Wn.2d 612, 620-21, 41 P.3d 1189 (2002).

The trial court did not violate Parker's right to confront or cross-examine an adverse witness. Parker seems to contend that the exclusion of his hearsay statement affected his right to confront A.W. But the right hardly allows a party to elicit a response from one witness in violation of hearsay rules to show an inconsistency with another witness's statements. And again, the trial court allowed Parker to cross examine A.W. about the matter.

D. Parker's Claims of Hearsay & Unfairly Prejudicial Evidence

Parker says that the trial court erred by admitting the following evidence: (1) a redacted version of the 911 call; (2) A.W.'s mother's testimony about A.W.'s statements when she arrived home; and (3) the SANE's testimony in which she reads A.W.'s narrative account of what happened. Parker says that the evidence was inadmissible hearsay and that the 911 call and A.W.'s mother's testimony were unfairly prejudicial under ER 403. The State responds that the first two were admissible under the excited utterance exception, and the third was admissible under the exception for statements made for medical diagnosis. We conclude that the trial court acted within its discretion in admitting most of the 911 call and Nephew's testimony. The one statement in the 911 call that the trial court erred in admitting was harmless. As for the SANE's testimony, we

22

conclude that while the trial court erred by admitting portions of it, the error was harmless.

"The admission of evidence is reviewed for abuse of discretion." City of Auburn v. Hedlund, 165 Wn.2d 645, 654, 201 P.3d 315 (2009). "A trial court abuses its discretion if the 'exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons.'" In re Det. of Post, 170 Wn.2d 302, 309, 241 P.3d 1234 (2010) (quoting State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). "We 'can affirm the trial court's rulings on any grounds the record and the law support.'" State v. Haviland, 186 Wn. App. 214, 223, 345 P.3d 831 (2015) (quoting State v. Grier, 168 Wn. App. 635, 644, 278 P.3d 225 (2012)).

    1. Nephew's testimony and 911 call

       a. Excited utterance

Parker says that because A.W. lied and omitted information when telling her mother what happened when she arrived home, her statements to her mother and on the 911 call were no longer excited utterances. Parker says that the decision to omit information or lie shows that A.W. could deliberate and thus was no longer under the stress of the event. The State responds that omissions and even lies do not necessarily render the excited utterance exception inapplicable. The State says that A.W.'s emotional state shows that her statements were excited utterances made under the stress of the event. We conclude that the trial court acted within its discretion in admitting Nephew's testimony and most of the 911 call. The one portion of the 911 call that the trial

court erred in admitting was harmless.

Hearsay is an out of court statement offered to prove the truth of the matter asserted. ER 801; ER 802. A trial court may admit hearsay as an excited utterance if it is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803. A party may establish whether the declarant made the statement while under the stress of the event by circumstantial evidence "such as the declarant's behavior, appearance, and condition, appraisals of the declarant by others, and the circumstances under which the statement is made." State v. Young, 160 Wn.2d 799, 809–10, 161 P.3d 967 (2007).

Generally, if a declarant fabricated a portion of a hearsay statement, a trial court may not admit the statement as an excited utterance. State v. Magers, 164 Wn.2d 174, 188, 189 P.3d 126 (2008). But in Magers, our Supreme Court determined that the fact that the complaining witness "told the police a falsehood . . . does not mean that the remainder of her statements were not spontaneous and truthful" and held that the trial court did not abuse its discretion in admitting her statements. Id. Thus, the rule on fabrication does not impose a categorical bar.

i. Nephew's testimony

Nephew testified at trial about what A.W. said to her when she arrived home. She said that A.W. explained that she was waiting for a bus when Parker drove up and offered her a ride. Nephew testified that A.W. told her that Parker "creeped her out" and when she tried to get away he "put a knife to her and told

her to get in the car." She said that A.W. told her that Parker drove her out of town to a place she did not recognize. Nephew said that A.W. said that she wrote Parker's license plate number on her arm as he drove away. Finally, she testified that A.W. said that she had not known Parker and that once he dropped her off "nobody at the Chevron would let [A.W.] use the phone." Parker objected to these statements as hearsay. The trial court overruled the objections, determining that the testimony was admissible as excited utterances. During trial, A.W. revealed that someone lent her their phone and she called her boyfriend before she got home. She also initially did not tell her mother that she was with her boyfriend that day and that she had possessed marijuana.

As the State says, omissions do not necessarily mean that a statement is not an excited utterance. In State v. Woods, our Supreme Court concluded that the complaining witness's statements were excited utterances even though she did not tell her father that she had been drinking and wanted to buy drugs. 143 Wn.2d 561, 600, 23 P.3d 1046 (2001). Similarly, A.W. did not tell her mother that she had been with her boyfriend that day and that she had used and possessed marijuana. These omissions do not necessarily show that A.W. deliberated after the attack about what she would say to her mother and that she was no longer under the stress of the attack.

That A.W. seemingly lied about not being able to borrow a phone may present a closer question. Nephew testified that before she called 911, A.W. told her that "nobody at the Chevron would let her use the phone." A.W. testified at trial that someone lent her their phone and she called her boyfriend. But where

25

A.W. obtained the phone is unclear. The record does not necessarily show that she lied in saying that no one at the Chevron gas station would lend her a phone.

And even if A.W. did lie, the trial court still acted within its discretion. A.W.'s boyfriend testified that she was highly emotional when she called him before she arrived home and Nephew testified that A.W. was crying and behaving erratically when she arrived. See Woods, 143 Wn.2d at 599 (finding that the declarant was still under the stress of the event because she was "very emotional, very distraught, clearly upset"). And a lie or a fabrication does not automatically render a statement inadmissible. See id. at 600 (holding that the fact that the declarant told her father that she had gone to bed early when she was still awake and "ready to party" did not mean that her declarations were not an excited utterance). A.W.'s possible lie here does not mean that her statements were no longer excited utterances. Compare State v. Brown, 127 Wn.2d 749, 758, 903 P.2d 459 (1995) (holding that the trial court's admission of a 911 call recording as an excited utterance was erroneous given that the declarant fabricated a story about being abducted on the call), with Magers, 164 Wn.2d at 188 (holding that the fact that the declarant lied to police did not render her other statements inadmissible given the totality of the circumstances and the fact that her lie was motivated by fear of the defendant).

Given the foregoing, we cannot say that the trial court abused its discretion in admitting the statements at issue as excited utterances.

ii. 911 call

The State sought to introduce a redacted version of the 911 call that

26

Nephew made shortly after A.W. returned home. The State said they wanted to show A.W.'s audible distress after being told that she could not change out of her clothing. Parker objected, saying that the recording was inadmissible double hearsay and violated ER 403.

In the recording, Nephew says that her daughter was taken at knifepoint and raped. Dispatch tells her not to let A.W. change her clothes, and when Nephew relays the information, A.W. sobs. Dispatch then questions A.W. through Nephew about the description and license plate number of the car. A.W. cries as she answers the questions and says in a distressed tone "they want me to keep my clothes on." The rest of the call is redacted.

The trial court ruled that A.W.'s statements on the 911 call were hearsay and admissible as excited utterances. The court expressed some concern about the fact that Nephew was the one to relay the messages back and forth but decided that her statements were res gestae and admissible to provide context, noting that Nephew was subject to cross-examination.

During trial, A.W. revealed that she called her boyfriend after the attack despite initially claiming to law enforcement and in her initial testimony that no one had let her use their phone.[14] Parker objected again to the 911 call, contending that this lie indicated that her later statements on the 911 call were not excited utterances. The court overruled the objection, noting that she was emotional on the phone call with her boyfriend and still emotional when she

---

[14] Because A.W. made these statements well after she made the comments admitted as excited utterances, we do not consider them in our analysis.

arrived home. The trial court gave a limiting instruction when the 911 call was introduced, telling the jury that they could consider the 911 call "only with regard to statements made by [A.W.]. You may not consider for any other purpose statements made by other people other than [A.W.]. Such statements must not be considered for any purpose other than to put the statements made by [A.W.] into context."

Most of the 911 call is not hearsay because it did not contain out-of-court statements offered to prove the truth of the matter asserted. Parker did not dispute that A.W. was in his car. So presumably, the State did not offer the discussion about Parker's car to prove the truth of the matter asserted. Dispatch's directive not to remove clothing, as transmitted by Nephew, could not conceivably have been offered for the truth of any matter asserted. A.W.'s cries are not statements. And even if anything A.W. said was hearsay, the trial court properly admitted as an excited utterance based on the analysis in the subsection above. In light of the foregoing, we cannot say that the trial court abused its discretion in admitting most of the 911 call.

The only inadmissible hearsay statement appears to be Nephew's assertion at the beginning of the 911 call that her daughter had been taken at knifepoint and raped. No hearsay exception appears to apply to this statement.[15]

---

[15] The trial court ruled that Nephew's statements on the 911 call were admissible under the res gestae doctrine. But as Parker correctly notes, Nephew's statements on the 911 call do not fall under this category because she did not observe or participate in the attack. See State v. Pugh, 167 Wn.2d 825, 837–38, 839–40, 225 P.3d 892 (2009) (noting that the res gestae doctrine evolved into several common law hearsay exceptions and requires the declarant to have observed or participated in the event).

But any error in admitting Nephew's statement on the 911 call was harmless. Error is prejudicial if it "presumptively affects the outcome of the trial." Barriga Figueroa v. Prieto Mariscal, 193 Wn.2d 404, 415, 441 P.3d 818 (2019). "Improper admission of evidence constitutes harmless error if the evidence is cumulative." Id. The outcome of the trial would not have been materially affected because Nephew's statement is cumulative of her testimony and A.W.'s testimony. Also, the trial court instructed the jury to disregard statements made by people other than A.W. See In re Pers. Restraint of Phelps, 190 Wn.2d 155, 172, 410 P.3d 1142 (2018) ("Jurors are presumed to follow the court's instructions."). Finally, that the jury acquitted Parker suggests that Nephew's statement in the 911 call was not unfairly prejudicial as to the rape charge.

> b. ER 403

Parker says that the trial court should have excluded the 911 call and Nephew's testimony as unfairly prejudicial under ER 403. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or needless presentation of cumulative evidence" would result. ER 403.

Parker did not object on ER 403 grounds to Nephew's testimony so he waived that argument. See State v. Scherf, 192 Wn.2d 350, 386, 429 P.3d 776 (2018) ("a party may assign error on appeal only on the specific ground of the evidentiary objection made at trial.").

As for the 911 call, the trial court did not abuse its discretion by admitting the call over Parker's ER 403 objection. The 911 call was highly probative to

show A.W.'s emotional state shortly after the attack; it showed, rather than described, her emotional state to the jury. Granted, demonstrating A.W.'s emotional state may be somewhat prejudicial. But Parker cites no cases supporting his ER 403 claim of unfair prejudice. And we cannot say the trial court abused its discretion by determining that any risk of unfair prejudice does not substantially outweigh the probative value of the redacted 911 call.

### 2. SANE's testimony

A court may admit hearsay if it is a statement "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."[16] ER 803(a)(4). "The exception applies only to statements 'reasonably pertinent to diagnosis or treatment.'" State v. Butler, 53 Wn. App. 214, 217, 766 P.2d 505 (1989) (quoting 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 367, at 224 (2d ed. 1982)). And in some cases it may be "necessary to delete the inadmissible portion and admit the rest." Id. The medical diagnosis and treatment exception includes psychological treatment. Woods, 143 Wn.2d at 602.

_____

[16] In State v. Urbina, the court held that statements about being thrown down, raped, threatened, and using mace were all admissible as reasonably pertinent for diagnosis and treatment of physical and psychological injuries. No. 76890-5-I, slip op. at 12-13 (Wash. Ct. App. Nov. 13, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/768905.pdf; see GR 14.1 ("Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions"). The court held, however, that statements about the alleged victim not trusting the police, the defendant stopping at a store to buy beer, and the alleged victim feeling uncomfortable at the defendant's home were not similarly admissible. Id.

The State sought to have the SANE testify and read A.W.'s narrative of the attack from her notes. Parker objected on hearsay grounds. The trial court noted that it was a "borderline" situation but admitted the testimony under the exception for statements made for medical treatment or diagnosis. The SANE testified that the sexual assault examination has both medical and forensic components, and that the nurse collects the narrative story of "what happened" before the physical examination begins. The SANE then read A.W.'s narrative verbatim from her notes:

> I crossed the street to catch the bus to the Tacoma Mall so I could go home. And then a car went through the Shell parking lot, came around to where he was in front of me and parked at the light. Then he tried to ask me where I was heading—headed, excuse me— and if I needed a ride.

> I told him no and he drove off. And I start walking down 38th so I would be at another bus stop. But he followed me down 38th Street. And he kept honking at me, continuously asking me if I needed a ride. But every time I told him no.

> He turned around twice and came back, and when I thought he was gone I turned right on 37th Street. I saw him pass me again. He didn't say anything. He just went past.

> But I ran into the nearest alley so I could take a shortcut to my friend's house. And he had gone around the street, come around the other side of the alley. And his headlights were off, and I didn't know that he was coming.

> *I was going right towards him until I saw him, but he was quicker than me and he got out of the car and grabbed me.*

> *He held the knife to my neck and then told me not to yell or do anything stupid, to cooperate or he would stab me. And then he put me in the back of the car and tied my hands behind my back. Then he got in the front, was driving for a while, and then we stopped.* He had turned in to one of those turnaround spots where cars turn.

> I couldn't see much with the snow. There was a store right across the road with a gravel road thing.

> Then he made me get into the front passenger seat. *He said,*

*don't do anything stupid. I already told you I will stab you. Then he searched through my purse and took the ten dollars that I had and asked me if I had anything else on me, and he said if I was lying he would stab me; that I was not cooperating if I was lying.*

He made me take my shoes off and give to him so he could see if I was hiding anything. Then he took my jacket off and searched every pocket to see if there was anything in it.

*He had already cut off—he untied, like, plastic ties so I could get the jacket off.* Then he took off my second jacket to see if there was anything there. Then he did my—then he did—excuse me— then he undid my bra and checked up in there to see if I was hiding anything up there.

Then he checked my pants pockets. Then he made me take my pants off. Then he checked my underwear to check I wasn't hiding anything in there. He took off—then he took his—then he took off his jacket, then told me to cooperate and not do anything stupid.

He made me take my underwear off. He climbed over on his knees on the floor of the car. He pushed the little lever thing and made the seat go back, and he pulled his shirt over his head. Then he then pulled my shirt off and stuff.

*Then he pulled me to the edge of the seat and made me put my feet on the dashboard. Then he entered me, I guess. Then he was sucking on me, and he kept his head on my neck the whole time. Then he, with his left hand grabbed my hip and pulled me closer. He was just doing what he was doing for about half an hour.*

Then when he was done he got off me, told me to put my clothes on. And then he said, I should just leave you out here, but I have some sympathy for you.

Then he asked me where I lived. I think he wanted me to tell him. I'm not sure why, if he wanted to know or to let me off so because I was cooperative he would take me home.

Then on the ride there about 40 minutes and he was talking the whole time telling me where he was from, what he usually was doing. Then he tried to tell me this wasn't something he did every day. Then he dropped me off on 54th, right the street before Chevron. Then he tried to tell me to be safe and he was sure that taught me a lesson and all that.

Then I got a license number before he drove off. Then I walked home. I tried to get 50 cents or use a cell phone. No one seemed to want to help. So I walked to there.

32

That's pretty much what happened.

(Emphasis added.)

Some of the narrative—highlighted in italics—appears admissible. The purpose of the SANE's exam is partially medical; the SANE conducts an exam to ensure that the patient does not need further medical treatment. See State v. Williams, 137 Wn. App. 736, 747, 154 P.3d 322 (2007) (holding that ER 803(a)(4) applies when an exam has the dual purpose of gathering evidence and identifying treatable injuries). Descriptions of being bound, raped, and threatened were reasonably pertinent to the diagnosis or treatment of A.W.'s physical or psychological injuries. And Parker concedes that statements about being bound and raped are admissible. But the remaining portions appear inadmissible. Yet even if the trial court erred by admitting those portions, any error was harmless.

We review a trial court's evidentiary ruling for harmless error. Barriga Figueroa, 193 Wn.2d at 415. Error is prejudicial if it "presumptively affects the outcome of the trial." Id. "Improper admission of evidence constitutes harmless error if the evidence is cumulative." Id.

The content of the testimony was duplicative of A.W.'s testimony at trial. See Williams, 137 Wn. App. at 747 ("Jacobsen's testimony was consistent with JAD's statements and any error in admitting Jacobsen's statements was harmless."). And that A.W. testified at trial and was subject to cross-examination diminished the risk of prejudice arising from these hearsay statements. See State v. Ramirez-Estevez, 164 Wn. App. 284, 293, 263 P.3d 1257 (2011) (finding

that being subject to "cross-examination itself diminished, if not extinguished, the type of prejudice that sometimes results from admission of hearsay where the declarant is not subject to cross-examination at trial."). And the portions that appear inadmissible are not the most probative portions as to the charged crimes. Cf. Urbina, No. 76890-5-I, slip op. at 13 (Wash. Ct. App. Nov. 13, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/768905 ("the inadmissible statements reinforced A.R.'s testimony only as to a few peripheral points"). Finally, that the jury acquitted Parker of the rape charge suggests that the evidence was not unfairly prejudicial as to that charge.

E. Prosecutorial Misconduct

Parker says that prosecutorial misconduct requires reversal. He contends that in closing argument the two prosecutors inflamed the passions and prejudices of the jury and denigrated defense counsel. He also says that the prosecutors committed misconduct by successfully moving to exclude evidence that Parker knew A.W. and then emphasizing that lack of evidence during closing. We do not see a basis for reversal on this issue.

We review allegations of prosecutorial misconduct under an abuse of discretion standard. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). "The trial judge is generally in the best position to determine whether the prosecutor's actions were improper and whether, under the circumstances, they were prejudicial." State v. Ish, 170 Wn.2d 189, 195–96, 241 P.3d 389 (2010).

A prosecutor must ensure that they do not violate a defendant's rights to a constitutionally fair trial. State v. Monday, 171 Wn.2d 667, 676, 257 P.3d 551

(2011). "A prosecutor's closing argument should be free of appeals to passion and prejudice, and be confined to the evidence." State v. Prado, 144 Wn. App. 227, 253, 181 P.3d 901 (2008).

To establish misconduct, the defendant bears the burden of first showing that the prosecutor's comments were improper. State v. Boyd, 1 Wn. App. 2d 501, 517–18, 408 P.3d 362 (2017); State v. Emery, 174 Wn.2d 741, 759, 278 P.3d 653 (2012).

> Once a defendant establishes that a prosecutor's statements are improper, we determine whether the defendant was prejudiced under one of two standards of review. If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned [sic] that an instruction could not have cured the resulting prejudice.

Emery, 174 Wn.2d at 760–61 (citation omitted). If defense counsel fails to object to allegedly improper comments made by a prosecutor, it "strongly suggests" that the comments "did not appear critically prejudicial to [the defendant] in the context of the trial." State v. McKenzie, 157 Wn.2d 44, 53 n.2, 134 P.3d 221 (2006) (emphasis omitted) (quoting State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)). We do not examine improper conduct in isolation but determine its effect by looking at "the full trial context, including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" Monday, 171 Wn.2d at 675 (internal quotation marks omitted) (quoting McKenzie, 157 Wn.2d at 52).

1.  Inflaming passions and prejudices

Parker says that the following statements by the prosecutors during closing argument improperly inflamed the passions and prejudices of the jurors to make them more sympathetic to A.W. and to improperly bolster A.W.'s credibility. We address each statement in turn.

First, while the State explained the burden of proof, Parker objected, saying that the prosecutor was trying to gain the sympathy of the jury by "practically crying to this jury" and referring to A.W.'s "distress and hysteria" during the 911 call. The trial court overruled, noting that it saw no indication that the prosecutor was crying. An accusation that the prosecutor was "practically crying" without more, is not enough to support a finding of misconduct. And pointing out A.W.'s distress and hysteria was not improper. See State v. Borboa, 157 Wn.2d 108, 122–23, 135 P.3d 469 (2006) (holding that a prosecutor's references "to the 'horrible' nature of the crime and the [emotional] effect on its victims was not misconduct.").

Second, the State referenced A.W.'s "truth about what happened" and "the truth that [A.W.] testified to" compared to Parker's version of events. Parker did not object. See State v. Gauthier, 189 Wn. App. 30, 38–39, 354 P.3d 900 (2015) (noting that if defense counsel does not object or request a curative instruction it "strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial." (quoting Swan, 114 Wn.2d at 661)). That the State twice reminded the jurors that they were "the sole judges of the credibility of [the] evidence" ameliorates any

36

prejudice of such statements. And a curative instruction would have sufficed to address any impropriety in referring to the complaining witness's version of events as the "truth." See Emery, 174 Wn.2d at 760–61 (stating that the standard of review when the defendant failed to object to a comment a trial is whether the prosecutor's misconduct was so flagrant and ill-intentioned that a curative instruction could not address the prejudice).

Third, the State pointed out that testifying "was not an easy experience for [A.W.]. She tried to be careful. She didn't overstate her recollection. She was honest when there were things that she couldn't recall. She was resilient." The State then said that A.W. was being "asked to relive the thing that she's tried to block out of her memory." The trial court overruled Parker's objection. While discussions about an alleged victim's difficulty with testifying about a crime may invoke some sympathy on the part of the jury, this does not rise to the level of inflaming the passions and prejudices of the jury. See Prado, 144 Wn. App. at 253.

Finally, the State discussed A.W.'s emotional response when she arrived home, saying: "There is emotional truth to what she describes and to what her mother describes and to what ultimately you can hear." The State also referenced the "emotional truth" of a moment where she discovered her old journal, pointing to the fact that she did not destroy it despite its inconsistencies with her testimony. Parker did not object. These references to the "emotional truth" of A.W.'s reactions were not misconduct, particularly given Parker's challenges to A.W.'s credibility throughout trial. See State v. Warren, 165 Wn.2d

17, 30, 195 P.3d 940 (2008) (finding that the prosecutor's comments that details in the complaining witness's testimony gave it a "badge of truth" and a "ring of truth" were not improper given defense counsel's attacks on the alleged victim's credibility); see also In re Det. of Stout, 159 Wn.2d 357, 383, 150 P.3d 86 (2007) ("Witness demeanor is a crucial part of determining credibility."). The prosecution's inferences stemmed from testimony and the 911 call. See State v. Lewis, 156 Wn. App. 230, 240, 233 P.3d 891 (2010), as amended (June 2, 2010) ("a prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence"). And a jury instruction could have cured any prejudicial effect. See Emery, 174 Wn.2d at 760–61 (stating that the standard when the defendant failed to object to a comment a trial is whether the prosecutor's misconduct was so flagrant and ill-intentioned that a curative instruction could not address the prejudice).

To the extent Parker made objections to the above statements, the trial court acted within its discretion in overruling them.

2. Denigrating counsel

"It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity." State v. Thorgerson, 172 Wn.2d 438, 451, 258 P.3d 43 (2011). We consider comments made during rebuttal closing more prejudicial. Lindsay, 180 Wn.2d at 443. Prosecutors may make a "fair response" to arguments by defense counsel. Gauthier, 189 Wn. App. at 37–38. "Even where the comments are improper, the remarks by the

prosecutor are not grounds for reversal 'if they were invited or provoked by defense counsel and are in reply to [their] acts and statements.'" Id. at 38 (quoting State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)).

In Gauthier, defense counsel argued that the jury should doubt the complaining witness's credibility and suggested that she was a prostitute, drug user, and thief. 189 Wn. App. at 35. During rebuttal closing the prosecutor said, "[T]here is not one iota, one piece, one shred of evidence, besides the testimony of this man, that [TA] worked as a prostitute." Id. at 36 (second alteration in original). The prosecutor then said the defense was like a cliché and why people do not report sexual crimes. Id. The prosecution then asked why the alleged victim would go through the entire experience if she was lying. Id. The defense did not object to any of these remarks. Id. at 37. The court held that the prosecutor's comments were a fair response to defense counsel's closing argument. Id. at 38.

Parker says that the following statements the prosecution made during rebuttal closing improperly denigrated defense counsel by making it seem that defense counsel was trying to distract the jury from the evidence.

First, the State said that "apparently" victims of rape and kidnapping "have to behave in a certain way" to avoid criticism and seem credible. Parker objected, and the trial court overruled the objection. During closing argument, defense counsel implied that A.W. was, and still is, a liar and a thief. He also highlighted how A.W. was untruthful or not immediately forthcoming, including about who she was with on the day of the incident, her possession and use of

marijuana, and whether she could borrow a cell phone. He suggested that a rape victim would have called 911 or their mother and not their boyfriend. He also said that A.W. "bald face lied." Under Gauthier, the prosecutor's comment was a fair response to the defense's challenges to A.W.'s credibility. 189 Wn. App. at 38.

Second, the State said that there was "no evidence" to support Parker's version of the story and that "all of the evidence" was "to the contrary." Parker objected that this denigrated counsel. The trial court overruled his objection. It may be a reach to say "no evidence" supports Parker's defense theory. But this does not rise to the level of impugning Parker's defense counsel's integrity. See Lindsay, 180 Wn.2d at 431–32 ("A prosecutor can certainly argue that the evidence does not support the defense theory.").

Third, the State said that defense counsel wanted the jury to focus on what the police failed to do in a vacuum and to "[t]ake it out of context and ignore everything else." Parker objected to this as denigrating counsel and the trial court overruled the objection. This appears to present a closer question because it may suggest that the defense is trying to mislead the jury by focusing on the wrong things. But this was a fair response to defense counsel's argument that the police did not do their jobs. Cf. State v. Teters,[17] (holding that prosecutor's comment that defense was trying to "distract" the jury from "the real issue" was proper because the main point was that the defense was relying on evidence

---

[17] No. 49357-8-II, slip op. at 6 (Wash. Ct. App. Feb. 20, 2019) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2049357-8-II%20Unpublished% 20Opinion.pdf, review denied, 193 Wn.2d 1020, 448 P.3d 65 (2019).

irrelevant to the case); see GR 14.1 ("Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions").

Fourth, the State said, "Defense wants you to focus on anything but the evidence." The State made this comment in the context of explaining that defense counsel's theories—such as the theory that Parker could not have put A.W. in his backseat because there were belongings in the way—were not evidence. Parker objected saying that the comment degraded the defense. The court overruled. This comment does not amount to prosecutorial misconduct. Cf. State v. Guizzotti, 60 Wn. App. 289, 297, 298, 803 P.2d 808, 813 (1991) (concluding that prosecutor's description of the defense as "a little bit of smoke . . . attempted [sic] to confuse the evidence" was not misconduct).

Fifth, the State said, "All of [A.W.'s] testimony is evidence, and nothing that defense counsel can argue changes the fact that her testimony is evidence." Parker did not object. This is not misconduct; it is a fair response to defense's challenges to A.W.'s credibility. See Gauthier, 189 Wn. App. at 38. And a jury instruction could have cured any prejudicial effect. See Emery, 174 Wn.2d at 760–61 (stating that the standard when the defendant failed to object to a comment a trial is whether the prosecutor's misconduct was so flagrant and ill-intentioned that a curative instruction could not address the prejudice).

Sixth, the State said that defense counsel called A.W. a liar "multiple times." Parker objected but did not have a chance to specify a reason. The court overruled the objection. Defense counsel implied more than once that A.W.

was a liar. So this was not a mischaracterization by the State; it was a fair response to the defense. See Gauthier, 189 Wn. App. at 38.

> Finally, the State said that A.W.'s
>
> life and her actions both now as an adult and then when she was 17 are criticized and judged.
>
> She's criticized for not behaving appropriately, for not taking a route that makes sense, for not telling people I smoked marijuana, I spent the day with my boyfriend while she is on the stand telling you about this awful thing that happened to her ten years ago.

Parker objected and the trial court overruled the objection. This is not misconduct; it does not suggest that defense counsel was acting without integrity and it is a fair response to challenges to A.W.'s credibility. See Gauthier, 189 Wn. App. at 38.

To the extent Parker made objections to the above statements, the trial court did not abuse its discretion in overruling them. And even if the comments were misconduct, they did not have a substantial likelihood of affecting the outcome of the trial. Parker says that the acquittal of the rape charge shows that the jury did not fully believe A.W., suggesting that they would have believed even less of her testimony without the improper remarks by the prosecutors. But the acquittal may cut in the other direction as well. That the jury acquitted Parker on the rape charge may show that the jury was weighing the evidence carefully and did not allow their emotions to cloud their assessment. The prosecutors' improper comments were unlikely to change the outcome of the case. Compare Thorgerson, 172 Wn.2d at 452 (concluding that characterizing the defense as "sleight of hand" was unlikely to have altered the outcome of the case), and State

v. Negrete, 72 Wn. App. 62, 66–68, 863 P.2d 137 (1993) (concluding that reversal was not required based on comment that the defense was "paid to twist the words of the witnesses"), with Lindsay, 180 Wn.2d at 442–43 (determining that multiple comments about the defense counsel's truthfulness, including calling the defense "a crock," were likely to influence the jury's verdict).

    3.  Emphasizing the lack of evidence that Parker knew A.W.

Parker says that the prosecutors committed misconduct by successfully moving to exclude evidence that he knew A.W. and then arguing during closing that there was no evidence to show that he knew A.W. The State says that it did not seek to exclude the evidence entirely, just the hearsay form of it; and it emphasizes that the evidence showed that Parker knew A.W.'s name after, and not necessarily before, the attack. We conclude that the prosecutors did not commit misconduct.

Parker relies on State v. Kassahun, 78 Wn. App. 938, 946, 900 P.2d 1109 (1995). There, the defendant sought to obtain evidence from the police of the alleged victim's gang membership to support his self-defense theory. Id. The trial court barred the defendant from conducting discovery and introducing objective evidence but permitted him to testify as to his own subjective belief that the alleged victim was a gang member. Id. The defendant testified about his experiences with gang activity working as a store clerk. Id. During closing, the prosecutor said that the defendant "tried to paint a picture of lawless gangs taking over and running the show in the parking lot, everywhere, but where was the evidence of that?" Id. The defendant objected. Id. at 947. We held that:

> Having prevailed . . . in its effort to preclude Kassahun from discovering objective evidence of Walker's gang membership . . . it was misconduct for the prosecutor to imply in argument to the jury that Kassahun was being untruthful because he failed to offer objective evidence to support his belief that his business was being overrun by gangs.

Id. at 952. But we reversed on other grounds and did not decide on the prejudicial effect of the misconduct. Id.

During the State's closing argument, a prosecutor called Parker "the man [A.W.] did not know when he abducted her in an alley." The prosecutor noted that A.W. could not "recall whether or not she gave the defendant her name. Certainly he forced her to give him her body and her property to survive. The notion that she would let her name, first name go to him is not surprising. She can't recall either way." And during rebuttal, the other prosecutor said:

> His entire argument about what happened that night are just his assertions. And I submit to you that his assertions, his theories that he just stood up here and postulated to you are just that, they're theories. They are not supported by any of the evidence in this case, and in fact, they're contradicted by the actual evidence that you have in this case.
>
>  . . .
>
> This is what his story is in a nutshell. And I submit to you there is no evidence to support this theory, and all of the evidence that you do have is to the contrary.

The prosecutor also said, "There is no evidence that [A.W.] and the defendant knew each other at all or communicated in any way prior to this happening." Parker did not object to these comments on the ground that the State improperly emphasized the lack of evidence.

Kassahun is distinguishable because the hearsay statement Parker sought to elicit from Detective Graham does not necessarily show that Parker

44

and A.W. knew each other before the attack. It shows that Parker knew A.W.'s first name *after* the attack. Even if the court had admitted the hearsay statement, the prosecutor still could have fairly said that there was no evidence that Parker and A.W. knew each other before the attack. See State v. Kasbaum, noted at 168 Wn. App. 1042, 2012 WL 2105859 at *7 (distinguishing Kassahun and noting that "the prosecutor could have made the same argument that the evidence did not support the defense theory even if the trial court admitted the hospital admission forms as evidence"); see GR 14.1.

Also, in Kassahun, the court prevented the defendant from conducting discovery to obtain objective evidence of gang membership; without the discovery, his subjective testimony was weak. 78 Wn. App. at 946. Here, the trial court did not similarly prevent Parker from conducting discovery. It prohibited him from eliciting his own hearsay statement.

Also, the State's comments were not so flagrant and ill-intentioned that a curative instruction could not have addressed any prejudice. See Emery, 174 Wn.2d at 760–61 (applying this standard of review when the defendant failed to object to a comment a trial).

F. LFOs

Parker says that if we do not reverse his convictions, we should remand the case for the trial court to strike the filing fee and interest accrual provision. The State agrees. We accept the State's concession and remand for proceedings consistent with our decision.

We review the decision to impose LFOs for abuse of discretion. State v.

Ramirez, 191 Wn.2d 732, 741–42, 426 P.3d 714 (2018). But if the question is legal, we review de novo. State v. Glover, 4 Wn. App. 2d 690, 694, 423 P.3d 290 (2018).

The trial court recognized Parker's indigence but imposed a $200 filing fee and included an interest accrual provision. The trial court must strike the filing fee and the interest accrual provision. See Ramirez, 191 Wn.2d at 739 ("House Bill 1783 . . . amends the criminal filing fee statute, former RCW 36.18.020(2)(h) (2015), to prohibit courts from imposing the $200 filing fee on indigent defendants. LAWS OF 2018, ch. 269, § 17(2)(h)."); RCW 10.82.090 ("[a]s of June 7, 2018, no interest shall accrue on nonrestitution legal financial obligations.").

We remand for a suppression hearing and other proceedings consistent with this opinion. We otherwise affirm.

WE CONCUR:

_____ Chun, J.

_____

_____ Smith, J.